**BOOKFRIENDS, INC., D.B.A. Wilkie News, et al., Plaintiffs,**

v.

**Bob TAFT, et al., Defendants.**

**No. C–3–02–210.**

United States District Court, S.D. Ohio, Western Division.

Aug. 30, 2002.

Henry Louis Sirken, Jennifer M. Kinsley, Sirkin Pinales Mezibov & Schwartz, Cincinnati, OH, Michael A. Bamberger, New York City, J. Michael Murray, Berkman Gordon Murray & Devan, Raymond V. Vasvari, Jr., Cleveland, OH, for Plaintiffs.

Carol Anne Hamilton O'Brien, Charissa Diane Payer, Elise W. Porter, Betty D. Montgomery, Ohio Attorney General, Columbus, OH, for Defendants.

DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. # 27); DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO STRIKE (DOC. # 41); DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS (DOC. # 42); DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO CERTIFY QUESTIONS TO THE OHIO SUPREME COURT (DOC. # 43); PRELIMINARY INJUNCTION ENTERED; CONFERENCE CALL SET

RICE, Chief Judge.

The Plaintiffs bring this action challenging the constitutionality of House Bill No. 8, which amended and reenacted certain provisions of the Ohio Revised Code. Those provisions prohibit the dissemination, etc., of materials to juveniles which come within the definition of "harmful to juveniles." House Bill No. 8 made these provisions expressly applicable to the internet for the first time. The Plaintiffs include a local bookseller, the National Association of Recording Merchandisers, the Ohio Newspaper Association, the operators of internet web sites which offer sexual advice, the Video Software Dealers Association and the operator of an internet web site which offers its users free access to poems, articles, essays, fiction, visual arts and photographs. The Defendants are the Governor and Attorney General of Ohio, as well as the Prosecuting Attorneys for each of Ohio's 88 counties.

In particular, the Plaintiffs contend that the definition of "harmful to juveniles," contained in reenacted § 2907.01(E) of the Ohio Revised Code, violates the First and Fourteenth Amendments to the United States Constitution. In addition, they argue that what they refer to as the "internet provision," primarily § 2907.01(J), violates the First and Fourteenth Amendments to and the Commerce Clause of the United States Constitution.[1] Reenacted § 2907.01(E) provides:

(E) Any material or performance is "harmful to juveniles," if it is offensive

---

1. As part of the "internet provision" in House Bill No. 8, the Plaintiffs also focus upon § 2907.35(D) and (F) of the Ohio Revised Code, which provide:

(D)(1) Sections 2907.31, 2907.311, 2907.32, 2907.321, 2907.322, 2907.323, and 2907.34 and division (A) of section 2907.33 of the Revised Code do not apply to a person solely because the person provided access or connection to or from a computer facility, system, or network not under that person's control, including having provided transmission, downloading, intermediate storage, access software, or other related capabilities that are incidental to providing access or connection to or from a computer facility, system, or network, and that do not include the creation of the content of the material that is the subject of the access or connection.

(2) Division (D)(1) of this section does not apply to a person who conspires with an entity actively involved in the creation or knowing distribution of material in violation of section 2907.31, 2907.311, 2907.32, 2907.321, 2907.322, 2907.323, 2907.33, or 2907.34 of the Revised Code or who knowingly advertises the availability of material of that nature.

to prevailing standards in the adult community with respect to what is suitable for juveniles, and if any of the following apply:

(1) It tends to appeal to the prurient interest of juveniles;

(2) It contains a display, description, or representation of sexual activity, masturbation, sexual excitement, or nudity;

(3) It contains a display, description, or representation of bestiality or extreme or bizarre violence, cruelty, or brutality;

(4) It contains a display, description, or representation of human bodily functions of elimination;

(5) It makes repeated use of foul language;

(6) It contains a display, description, or representation in lurid detail of the violent physical torture, dismemberment, destruction, or death of a human being;

(7) It contains a display, description, or representation of criminal activity that tends to glorify or glamorize the activity, and that, with respect to juveniles, has a dominant tendency to corrupt.

Newly enacted § 2907.01(J) provides:

(J) "Material" means one of the following:

(1)(a) As used in section 2907.311 of the Revised Code and in the portions of section 2907.31 of the Revised Code that pertain to materials that are harmful to juveniles but not obscene, "material" means any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, tape, or other tangible thing capable of arousing interest through sight, sound, or touch and, except as provided in division (J)(1)(b) of this section, includes an image or text appearing on a computer monitor or on a television screen, liquid crystal display, or similar display device used as a computer monitor or an image or text recorded on a computer hard disk, computer floppy disk, magnetic tape, or similar storage device.

(b) As used in section 2907.311 of the Revised Code and in the portions of section 2907.31 of the Revised Code that pertain to materials that are harmful to juveniles but not obscene, both of the following apply:

(I) Except as otherwise provided in division (J)(1)(b)(ii) of this section, "material" does not include an image or text that appears on a computer monitor or on a television screen, liquid crystal display, or similar display device used as a computer monitor while the monitor, screen, display, or device is actively connected to a web site on the internet.

(ii) "Material" includes an image or text that appears on a computer monitor or on a television screen, liquid crystal display, or similar display device used as a computer monitor while the monitor,

(3) Division (D)(1) of this section does not apply to a person who provides access or connection to a computer facility, system, or network that is engaged in the violation of section 2907.31, 2907.311, 2907.32, 2907.321, 2907.322, 2907.323, 2907.33, or 2907.34 of the Revised Code and that contains content that person has selected and placed in or on the facility, system, or network or content over which that person exercises editorial control.

 * * * * * *

(F) It is an affirmative defense to a charge under section 2907.31 or 2907.311 of the Revised Code as the section applies to an image transmitted through the internet that the person charged with violating the section has taken, in good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by juveniles to material that is harmful to juveniles, including any method that is feasible under available technology.

screen, display, or device is actively connected to a web site on the internet if the image or text is contained in an e-mail message or if the image or text is so appearing on the monitor, screen, display, or device during a direct presentation to a specific, known juvenile or group of known juveniles. The image or text is "material" under this division only regarding the application of section 2907.311 of the Revised Code and the portions of section 2907.31 of the Revised Code that pertain to materials that are harmful to juveniles but not obscene to the person who sends the e-mail message or who directly presents the image or text to the specific, known juvenile or group of known juveniles.

(2) As used in all provisions of sections 2907.01 to 2907.37 of the Revised Code that are not identified in division (J)(1) of this section, "material" means any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, or tape, or other tangible thing capable of arousing interest through sight, sound, or touch and in-cludes an image or text appearing on a computer monitor, television screen, liquid crystal display, or similar display device or an image or text recorded on a computer hard disk, computer floppy disk, compact disk, magnetic tape, or similar data storage device.

Section 2907.31 of the Ohio Revised Code makes it illegal for anyone to sell, deliver, furnish, disseminate, provide, exhibit, rent or present to a juvenile materials which come within the definition of "harmful to juveniles," or to allow a juvenile to review or to peruse such materials. Section 2907.311 of the Ohio Revised Code provides that it is illegal to display materials within the definition of "harmful to juveniles" at a commercial establishment, in a manner which can be viewed by juveniles as part of the invited general public.[2]

█ Shortly after initiating this litigation, the Plaintiffs filed a motion, requesting a preliminary injunction which would prevent the allegedly unconstitutional portions of House Bill No. 8 from becoming effective on Monday, August 5, 2002, as scheduled.[3] *See* Doc. # 27. The parties have briefed that motion, and, on Wednes-

---

**2.** Neither § 2907.31, nor § 2907.311 was amended or reenacted as part of House Bill No. 8.

**3.** The Plaintiffs have supported their request for a preliminary injunction with a number of declarations. *See* Doc. # 27. In some of those declarations, the declarant indicated that he believed that he would be prosecuted for various reasons if the legislation were not enjoined. The Defendants have moved to strike those portions of the declarations, arguing that the declarants are attempting to give legal opinions, without being qualified as experts on the law, and, further, that those opinions are not permissible under Rule 701 of the Federal Rules of Evidence, which governs lay opinions. *See* Doc. # 41. In opposing that motion, the Plaintiffs argue that the statements in question were submitted to establish that the Plaintiffs have standing to bring a pre-enforcement challenge to House Bill No. 8.

*See* Doc. # 45. In order to have standing to mount such a challenge, the Plaintiffs must have "an actual and well founded fear that the law will be enforced against them." *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The declarants' allegedly inadmissible statements all support the proposition that they have such a fear and, thus, standing. Accordingly, the Court overrules the Defendants' Motion to Strike (Doc. # 41). However, since the Plaintiffs have not argued that the statements in question can be utilized by the Court when ruling upon the merits of their constitutional challenges (as opposed to deciding whether they have standing to challenge the constitutionality of House Bill No. 8), the Court will not use the statements for that purpose.

day, July 31, 2002, the Court conducted an oral and evidentiary hearing on the Plaintiffs' motion. The Court now rules upon the Plaintiffs' request for preliminary injunctive relief.[4]

■ In opposing the Plaintiffs' request for a preliminary injunction, the Defendants rely, in part, on the proposition that the statutes in question must be interpreted much more narrowly than the Plaintiffs fear. To support their reading of the legislation, the Defendants have requested that the Court certify four questions to the Ohio Supreme Court, pursuant to Rule XVIII of the Ohio Supreme Court Rules of Practice. As a means of analysis, the Court will initially rule upon the Defendants' request to certify questions to the Ohio Supreme Court, following which it will turn to the Plaintiffs' request for preliminary injunctive relief. However, before engaging in that analysis, the Court will consider the question of whether the Plaintiffs have standing to present their constitutional challenges.[5]

## I. *Standing*

■ Although the Defendants have not expressly questioned the Plaintiffs' standing, the Sixth Circuit recently reiterated that "[s]tanding is a jurisdictional requirement and we are under a continuing obligation to verify our jurisdiction over a particular case." *In re Troutman*, 286 F.3d 359, 363 (6th Cir.2002). *See also, Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002). Accordingly, the Court must decide whether the Plaintiffs have standing to bring their constitutional challenge to the pertinent provisions of House Bill No. 8. The requirement for standing flows from Article III, § 2, of the United States Constitution, which grants federal courts jurisdiction over "cases and controversies." In *Zurich Insurance Company v. Logitrans, Inc.*, 297 F.3d 528 (6th Cir.2002), the Sixth Circuit reiterated the familiar three-part test which is applied to ascertain whether a plaintiff has standing:

> "First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.' Second, there must be a causal connection between the injury and the conduct complained [of]-the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action

4. On Friday, August 2, 2002, the Court issued a Temporary Restraining Order, preventing the Defendants, their employees, agents and anyone acting in concert with them from enforcing any provision of Chapter 2907 which criminalizes acts involving materials "harmful to juveniles," as defined by reenacted § 2907.01(E).
*See* Doc. # 49. The Court extended that Order on August 16, 2002.
*See* Doc. # 50.

5. The Defendants have moved for partial judgment on the pleadings. *See* Doc. # 42. With that motion, the Defendants argue that Governor Taft should be dismissed as a Defendant in this litigation, because he is without enforcement authority over House Bill No. 8. The Defendants also argue that, with respect to the Attorney General, Betty Montgomery, Plaintiffs claim premised upon Ohio law must be dismissed. The Plaintiffs have not opposed this motion, and, prior to the oral hearing, conceded that Governor Taft could be dismissed. At that point, the Court indicated that it would dismiss the Governor. With respect to the other branch of this motion, the Eleventh Amendment bars the Plaintiffs' state law claims against the Attorney General in her official capacity (the only capacity in which she has been sued), based upon the alleged violation of the Ohio Constitution. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir.1994). Accordingly, the Court sustains the Defendants' Motion for Partial Judgment on the Pleadings (Doc. # 42).

of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision."

*Id.* at 531 (quoting *Kardules v. City of Columbus,* 95 F.3d 1335, 1346 (6th Cir. 1996), quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). *See also, Coal Operators and Associates v. Babbitt,* 291 F.3d 912, 915 (6th Cir.2002) (noting that "the 'irreducible minimum' constitutional requirements for standing are proof of injury in fact, causation, and redressability").

During the oral and evidentiary hearing, the Defendants argued that this Court did not need to reach the Plaintiffs' claim that the definition of "harmful to juveniles," contained in reenacted § 2907.01(E), is overbroad in violation of the First Amendment, because the Plaintiffs do not disseminate "materials," as that term is defined by newly enacted § 2907.01(J). Although not phrased in terms of standing, this Court considers the Defendants' argument to question the Plaintiffs' standing. For reasons which follow, the Court rejects the Defendants' argument.

Newly enacted § 2907.01(J) defines "material," as a "book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, tape, or other tangible thing capable of arousing interest through sight, sound, or touch," and, under some circumstances, computers which are "actively connected to a web site on the internet." With this argument, the Defendants focus upon the definition of "material" as it relates to the internet. According to the Defendants, something shown on the internet constitutes material, only if the image or text is directly presented to a "specific, known juvenile or group of known juveniles." The Defendants argue that there is no evidence that the Plaintiffs directly present their internet web sites to such a juvenile or group of juveniles. This Court agrees with the Defendants that there was no evidence that any of the Plaintiffs directly presents its internet site to a specific, known juvenile or a group of known juveniles. Moreover, the Court agrees with the implicit premise supporting the Defendants' argument that, if the Plaintiffs do not disseminate "materials," it is unnecessary to consider whether those "materials" come within the statutory definition of "harmful to juveniles." Under that circumstance, the Plaintiffs would be without standing, since none would have suffered an injury-in-fact as a result of that definition. Nevertheless, the Court concludes that the Plaintiffs have standing.

As an initial matter, the definition of "material" includes books. One of the Plaintiffs in this litigation, Bookfriends, Inc., d.b.a. Wilkie News ("Bookfriends"), operates a bookstore. In his declaration, James Latham ("Latham"), co-owner of Bookfriends, states that a number of books which come within the definition of "harmful to juveniles" are sold from that store and are available for juveniles to browse or to purchase. Since Bookfriends has such books available for juveniles to purchase and to browse, it is subject to prosecution, without need to consider whether it disseminates "materials" from its internet site. Consequently, the Court concludes Bookfriends has standing to challenge the constitutionality of the definition of "harmful to juveniles."[6]

6. It bears emphasis that, when one plaintiff demonstrates that it has standing to challenge the constitutionality of a statute, it is not necessary for the District Court to consider whether the other plaintiffs also have standing. *See e.g., Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *Save Our Heritage v. F.A.A.,* 269 F.3d 49, 55 (1st Cir. 2001); *Kelley v. Selin,* 42 F.3d 1501, 1510

Moreover, at least one of the other Plaintiffs has demonstrated that it disseminates materials to juveniles through its computers, which materials come within the definition of "harmful to juveniles." Mitchell Tepper ("Tepper"), President of Plaintiff Sexual Health Network, Inc. ("SHN"), testified during the evidentiary hearing and has presented a declaration. Tepper explained that the SHN provides sexually-related information, education and other resources, targeting disabled individuals and those who love and care for such individuals. Tepper testified that the SHN provides such services to both adults and juveniles. The SHN offers its services to individuals through its web site. In particular, users of that web site may submit questions which are answered by the SHN's experts, including Tepper. Although some answers to the questions are posted on the SHN web site so that all its users can obtain the information, every questioner is answered directly with an e-mail. Under newly enacted § 2907.01(J)1(b)(ii), an image or text appearing on a computer monitor or similar display device used as a computer monitor, while the monitor or device is actively connected to a web site on the internet, is "material," if the image or text is either "contained in an e-mail message *or* if the image or text is so appearing on the monitor, screen, display, or device during a direct presentation to a specific, known juvenile or group of known juveniles." (Emphasis added). Since the SHN sends its responses by e-mail to those who have submitted questions, including juveniles, it disseminates "materials" to juveniles, even if its web site does not make a direct presentation to a specific, known juvenile or group of known juveniles.

Accordingly, the Court rejects the Defendants argument, which the Court has interpreted as questioning the Plaintiffs'

standing, that there is no need to consider the constitutionality of the definition of "harmful to juveniles," because the Plaintiffs do not disseminate "materials."

■ Additionally, one could question whether Plaintiffs have standing to challenge the constitutionality of the definition at issue, given that none of the Plaintiffs has ever been prosecuted for disseminating materials to juveniles, which allegedly come within the definition of "harmful to juveniles." The definition of that phrase has not been significantly altered since § 2907.01(E) was initially enacted in 1974. In *Babbitt v. Farm Workers,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), the Supreme Court addressed the question of when a plaintiff may have standing to challenge the constitutionality of a criminal statute:

A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). But "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); see *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Pierce v. Society of Sisters,* 268 U.S. 510, 526, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson,*

(6th Cir.), *cert. denied,* 515 U.S. 1159, 115

S.Ct. 2611, 132 L.Ed.2d 855 (1995).

415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); see *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Evers v. Dwyer,* [358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958)], *supra,* at 204, 79 S.Ct. 178. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court. *Younger v. Harris, supra,* at 42, 91 S.Ct. 746.

*Id.* at 298–99, 99 S.Ct. 2301. In *New Hampshire Right to Life Political Action Com. v. Gardner,* 99 F.3d 8 (1st Cir.1996), the First Circuit indicated that, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 15. The Fourth, Seventh and Eleventh Circuits have followed the approach adopted by the First Circuit. *See North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 710 (4th Cir.1999), *cert. denied,* 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000); *Commodity Trend Serv. v. CFTC,* 149 F.3d 679, 687 (7th Cir.1998); *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir.1998). In the absence of Sixth Circuit authority to the contrary, this Court will do the same.

Herein, the Plaintiffs presented evidence establishing that they engage in expressive activity which comes within the definition of "harmful to juveniles." To support that statement, the Court need only cite the books which are sold and displayed to juveniles by Bookfriends and the e-mails which the SHN sends to individuals submitting questions, including juveniles. In addition, the Defendants did not present "compelling contrary evidence" which could cause this Court to conclude that a credible threat of prosecution does not exist. Indeed, that such a threat of prosecution exists is bolstered by an examination of some of the decisions by Ohio courts, concluding that certain materials are "harmful to juveniles." For instance, in *Grosser v. Woollett,* 45 Ohio Misc. 15, 341 N.E.2d 356 (1974), *affirmed,* 1975 Ohio App. Lexis 6225 (1975), the Common Pleas Court for Cuyahoga County held that *Manchild in the Promised Land* by Claude Brown and *One Flew Over the Cuckoo's Nest* by Ken Kesey were "harmful to juveniles" and enjoined the Strongsville High School from using those books as part of its curriculum. In *State v. Loshin,* 19 O.O.3d 141 (1980), the store owner who displayed a T-shirt and scarf in his store, upon which a four-letter word beginning with "F" had been printed, was prosecuted for presenting material to juveniles which came within the definition of "harmful to juveniles." In *State v. Watkins,* 1995 WL 386861 (1995), the Greene County Court of Appeals affirmed the defendant's conviction for violating § 2907.31, concluding that the picture of his former wife he had exhibited to two juveniles, in which she was seen sitting on

a toilet, with only her face, arms and outer left thigh visible, came within the definition of "harmful to juveniles," because it depicted the human bodily function of elimination.

Accordingly, the Court concludes that the Plaintiffs have standing to challenge the constitutionality of the legislation in question.

## II. Defendants' Requests for Certification

■ The Defendants have requested that the Court certify the following questions to the Ohio Supreme Court, to wit:

1. Is the definition of "materials harmful to juveniles"-as set forth in [Ohio Revised Code § ] 2907.01(E) and repassed in House Bill 8–vague or properly construed in *pari materia* with *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and other United States Supreme Court precedents, and therefore "extremely precise in defining what conduct is prohibited," similar to [the Ohio Supreme] Court's holding in *State of Ohio v. Burgun*, 56 Ohio St.2d 354, 360, 384 N.E.2d 255 (1978)?

2. Is the definition of "materials harmful to juveniles"-as set forth in [Ohio Revised Code § ] 2907.01(E) and repassed in House Bill 8–overbroad or properly construed in *pari materia* with *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and other United States Supreme Court precedents, and therefore "adequately protec[tive of] the First Amendment values applicable to the states through the Fourteenth Amendment," similar to [the Ohio Supreme] Court's holding regarding the definition of "obscenity" in *State of Ohio v. Burgun*, 56 Ohio St.2d 354, 360, 384 N.E.2d 255 (1978)?

3. Does the criminal penalty for "dissemination of materials harmful to juveniles" as set forth in [Ohio Revised Code § ] 2907.31 apply to general broadcasts or presentations to the public, or only to directed presentations to a specific, known juvenile or group of juveniles as held in *State of Ohio v. Loshin*, 19 O.O.3d 141 (1980), and *State v. Zeh*, 7 Ohio App.3d 235, 455 N.E.2d 18 (1982), and ratified by the General Assembly's limiting language in House Bill 8?

4. Does [Ohio Revised Code § ] 2907.311, in view of the language of House Bill 8, apply to internet sites and other broadcast media, or only to brick-and-mortar establishments that display physical materials such as books, magazines and computer monitors that can be physically covered or hidden?

Doc. # 43 at 1–2.

The certification of questions of state law to the highest court of a particular state was discussed in *Virginia v. American Booksellers Assn.*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). Therein, the American Booksellers Association and others brought a facial challenge in federal court to a newly-enacted, Virginia statute which made it unlawful to display visual or written material which depicted sexually explicit nudity, sexual conduct or sadomasochistic abuse and which was harmful to juveniles. The District Court enjoined the enforcement of the statute and the Fourth Circuit Court of Appeals affirmed. The Supreme Court noted that the courts below had differed on the meaning of the statute and that no state court had yet had the opportunity to interpret the newly-enacted statute. Under those circumstances, and given that the interpretation of the statute adopted by the Virginia Supreme Court could drastically alter the

plaintiffs' constitutional challenge to the statute (the state had indicated that it would not defend the constitutionality of the statute if the plaintiffs' interpretation of it were correct), the United States Supreme Court decided to certify questions to the Virginia Supreme Court. The Supreme Court stressed, however, that a state statute must be "readily susceptible" to a narrowing construction in order to warrant certification.[7] *Id.* at 397, 108 S.Ct. 636. *See also, Stenberg v. Carhart,* 530 U.S. 914, 945, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (holding that certification is appropriate only where the state statute is "fairly susceptible" to a narrowing construction); *Houston v. Hill,* 482 U.S. 451, 471, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (same). For reasons which follow, this Court concludes that reenacted § 2907.01(E) is not readily or fairly susceptible to the narrowing construction proposed by the Defendants with questions 1 and 2. Therefore, the Court will decline to certify those questions. The Court likewise declines to certify questions 3 and 4, because the answer of the Ohio Supreme Court to those questions would not be determinative of the Plaintiffs' constitutional challenges.

With respect to questions 1 and 2, the Defendants contend that reenacted § 2907.01(E) merely adopts the test from *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as modified for juveniles by *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).[8] Simply stated, no one could reasonably read that statute in that manner. To do so would require that one rewrite

subsections (E)(1) and (2), add a new subsection (3) and delete existing subsections (3) through (7). The Ohio Supreme Court has repeatedly stressed that, in construing a statute and, thus, determining legislative intent, the duty of a court is "to give effect to the words used, not to delete words or to insert words not used." *State v. Maxwell,* 95 Ohio St.3d 254, 256, 767 N.E.2d 242, 244 (2002) (internal quotation marks and citation omitted). *Accord, Lesnau v. Andate Enterprises, Inc.,* 93 Ohio St.3d 467, 471, 756 N.E.2d 97, 101 (2001). Since the Ohio Supreme Court would be required to add language to and to delete language from reenacted § 2907.01(E), in order to interpret it in the manner advocated by the Defendants, this Court cannot conclude that reenacted § 2907.01(E) is readily or fairly susceptible to the meaning posited by Defendants.

Nevertheless, the Defendants argue that the Court must certify the first two questions to the Ohio Supreme Court, because of that court's decision in *State v. Burgun,* 56 Ohio St.2d 354, 384 N.E.2d 255 (1978). Therein, the Ohio Supreme Court upheld the constitutionality of Ohio Revised Code § 2907.01(F), which defined obscenity, by construing that statute *in pari materia* with *Miller,* even though that statute did not include the three-part test adopted in *Miller.* The *Burgun* court noted that, in *Miller,* the United States Supreme Court indicated that it did not intend for every state legislature to rewrite its obscenity statutes as a result of that decision. 384 N.E.2d at 259. Moreover, the *Burgun* court noted that the United States Su-

---

**7.** A narrowing construction is the interpretation of a statute in a manner which upholds its constitutionality, while at the same time limiting its applicability, thus rejecting a broader construction under which its constitutionality is in doubt. *See e.g., Eubanks v. Wilkinson,* 937 F.2d 1118, 1122–23 (6th Cir. 1991)

**8.** *Miller* defined obscenity for adults, while *Ginsberg* established the standards for determining whether materials are obscene for juveniles. Courts uniformly refer to *Ginsberg* as modifying the *Miller* test, even though *Ginsberg* was decided first. This Court will follow that convention.

preme Court had subsequently upheld the constitutionality of a state obscenity statute which had been "narrowed" by an "authoritative construction" in light of *Miller. Id.* at 260 (discussing *Ward v. Illinois,* 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977)). The *Burgun* court ignored the tenet of statutory construction that courts will neither add to nor delete from words selected by the General Assembly, by adding the three-part test of *Miller* to § 2907.01(F) and by deleting other language from that statute. For reasons which follow, this Court finds that *Burgun* does not support the Defendants' request to certify questions concerning the interpretation of reenacted § 2907.01(E) to the Ohio Supreme Court.

In *Burgun,* the Ohio Supreme Court was addressing the constitutionality of the definition of obscenity in Ohio's criminal code, only a very few years after the United States Supreme Court had decided *Miller.* In contrast, the challenge to the constitutionality of § 2907.01(E) comes nearly 30 years after the United States Supreme Court decided *Miller* and more than 35 years after it decided *Ginsberg.* In *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 213 n. 10, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the United States Supreme Court reiterated that to ban speech to juveniles, an expression "must be, in some significant way, erotic." Nevertheless, the Ohio General Assembly has reenacted § 2907.01(E) six times, the most recent of which was this year with House Bill No. 8, and in each instance has indicated that materials which are harmful to juveniles (and, thus, are banned as to juveniles) include a significant amount of speech which is not erotic. Consequently, this Court is compelled to conclude that the Ohio Supreme Court would not ignore the fundamental tenet of statutory construction that the duty of a court is "to give effect to the words used, not to delete words or to insert [additional] words."

*State v. Maxwell, supra.* In sum, reenacted § 2907.01(E) is not readily or fairly susceptible to the narrowing construction posited by the Defendants; therefore, the Court will decline to certify the Defendants' first and second questions.

■■■ The Court will decline to certify the third and fourth questions. Section 1 of Rule XVIII, providing for certification to the Ohio Supreme Court, provides that it "may be invoked when the certifying court, in a proceeding before it, determines there is a question of Ohio law that may be determinative of the proceeding." With respect to the third question, the narrowing construction proposed by the Defendants would not be determinative of these proceedings, since the statute would still prohibit a bookseller from selling a significant amount of literature and art, fully protected by the First Amendment, to a person known to the bookseller to be a juvenile. With respect to the fourth question, given that the Plaintiffs have not argued that § 2907.311 is unconstitutional because that statutory provision applies to internet sites, the meaning of § 2907.311 is not determinative in or dispositive of this proceeding.

Accordingly, the Court overrules Defendants' Motion to Certify Questions to the Ohio Supreme Court (Doc. # 43).

## III. Plaintiffs' Request for Preliminary Injunction

In *Memphis Planned Parenthood, Inc. v. Sundquist,* 175 F.3d 456, 460 (6th Cir. 1999), the Sixth Circuit restated the familiar four-part test which is applicable to motions for preliminary injunction:

"When ruling on a motion for a preliminary injunction, a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irrepa-

rable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others [and balancing the harm to the moving party if the injunction is denied against the harm to others if the injunction is granted]; and (4) whether the public interest would be served by issuance of the injunction."

*Id.* at 460 (quoting *Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir.1997)). *Accord, Wonderland Shopping Center Venture Limited Partnership v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1096 (6th Cir.2001); *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County*, 274 F.3d 377, 400 (6th Cir.2001). Those factors, rather than being prerequisites to the granting of an injunction, are to be balanced. *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir.1998). As a means of analysis, the Court will discuss the four factors in the above order.

*A. Likelihood of Success on the Merits*

■ The Plaintiffs contend that the definition of "harmful to juveniles" is overbroad in violation of the First Amendment to the United States Constitution, and is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment to that Constitution. In addition, the Plaintiffs argue that what they refer to as "the internet provision" of House Bill No. 8, newly enacted § 2907.01(J) and portions of § 2907.35, is overbroad in violation of the First Amendment, is void for vague-

ness in violation of the Due Process Clause of the Fourteenth Amendment and violates the Commerce Clause, Article 1, § 8 to the United States Constitution. For reasons which follow, the Court concludes that the Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the definition of "harmful to juveniles," contained in reenacted § 2907.01(E), is substantially overbroad.[9] Accordingly, the Court need not consider whether the definition of "harmful to juveniles" is unconstitutionally vague or whether "the internet provision" is unconstitutional in any manner asserted by the Plaintiffs.

As an initial matter, reenacted § 2907.01(E) does not define "harmful to juveniles" in accordance with the three-part test as adopted in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as modified for juveniles in *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). In *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), the Supreme Court reiterated the three-part test for *Miller*:

(a) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

9. A facial challenge to a statute will not succeed unless the statute is "substantially overbroad," *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), by which it is meant that "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications," *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). *See also, Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

*Id.* at 872, 117 S.Ct. 2329 (quoting *Miller,* 413 U.S. at 24, 93 S.Ct. 2607). The test is modified in accordance with *Ginsberg,* so that the second prong of the test focuses upon whether the material is "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors." 390 U.S. at 633, 88 S.Ct. 1274. As indicated, reenacted § 2907.01(E) does not contain all three parts of that test. In particular, that legislation does not require the factfinder to decide whether the material in question, taken as a whole, lacks serious literary, artistic, political or scientific value, the third factor in the *Miller* test. *See Reno,* 521 U.S. at 873, 117 S.Ct. 2329 (noting that the third prong of the *Miller* test "critically limits the uncertain sweep of obscenity definition"). In addition, although § 2907.01(E)(1) contains language similar to the first prong of *Miller,* the second and third prongs of that test need not be met in order to demonstrate that the material in question is deemed to be "harmful to juveniles." It bears emphasis that the three prongs of the *Miller* test are conjunctive, rather than being disjunctive; therefore, a book or movie is not obscene, unless all three prongs have been established. *Reno,* 521 U.S. at 873, 117 S.Ct. 2329. Moreover, even though § 2907.01(E)(2) contains language which is *somewhat* analogous to the second prong of the *Miller* test, as modified by *Ginsberg,* that statutory language does not require that the specified sexual conduct be depicted in a patently offensive manner (the key to the second prong), nor does it require that the first and third prongs of that test be established, before the material in question is deemed to be "harmful to juveniles."

In addition, the various subsections of reenacted § 2907.01(E) include materials in the definition of "harmful to juveniles" which are fully protected by the First Amendment, thus rendering the dissemination of those materials to juveniles a criminal offense. For instance, reenacted § 2907.01(E)(2) includes nudity as something within the definition of "harmful to juveniles." In *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Supreme Court held that a sweeping restriction which criminalized showing any nudity to a juvenile was unconstitutionally overbroad. That case arose out of a challenge under the First Amendment to a Jacksonville ordinance which outlawed nudity in films shown at drive-in theaters. The municipality attempted to sustain the constitutionality of the ordinance under the theory that it was necessary to protect juveniles from exposure to nudity. The Supreme Court rejected that assertion, concluding that, although it was permissible under the First Amendment to prevent juveniles from viewing sexually explicit nudity, the ordinance under consideration violated the First Amendment, because it outlawed all nudity. The *Erznoznik* Court held that "all nudity cannot be deemed obscene even as to minors." *Id.* at 213, 95 S.Ct. 2268. Therein, the ordinance defined nudity to include a bare buttocks of a male or a female and a female's bare breast. Similarly, § 2907.01(H) of the Ohio Revised Code defines nudity to include the showing of a male or female "buttocks with less than full, opaque covering, or of a female breast with less than full, opaque covering of any portion thereof below the top of the nipple." As did the ordinance in *Erznoznik,* the Ohio statutes do not merely prevent juveniles from viewing sexually explicit nudity. Indeed, under the Ohio statutes, it would be illegal to show an unmarried person, under the age of 18, a copy of a *National Geographic* in which indigenous women are pictured naked from the waist up. Consequently, in accordance with *Erznoznik,* a case which was decided nearly 27 years before

the Ohio General Assembly reenacted the definition of "harmful to juveniles" contained in § 2907.01(E), as part of House Bill No. 8, this Court is compelled to conclude that the legislation criminalizes expression that is fully protected by the First Amendment and that including all nudity in the definition of "harmful to juveniles" renders that definition substantially overbroad.

In addition, reenacted § 2907.01(E)(3) includes depictions of extreme violence within the definition of "harmful to juveniles." Courts have held that the First Amendment forbids governments from preventing juveniles from being exposed to depictions of violence. *See e.g., American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572 (7th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 462, 151 L.Ed.2d 379 (2001). Therein, the Seventh Circuit wrote:

> Classic literature and art, and not merely today's popular culture, are saturated with graphic scenes of violence, whether narrated or pictorial.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Violence has always been and remains a central interest of humankind and a recurrent, even obsessive theme of culture both high and low. It engages the interest of children from an early age, as anyone familiar with the classic fairy tales collected by Grimm, Andersen, and Perrault is aware. To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it.

*Id.* at 575, 577. *See also, Video Software Dealers Ass'n v. Webster,* 968 F.2d 684, 688 (8th Cir.1992) (affirming the entry of preliminary injunction, enjoining a state statute which prohibited the distribution of videos depicting violence to juveniles). Accordingly, the Court concludes that § 2907.01(E)(3) criminalizes expression which is fully protected by the First Amendment and that the definition of "harmful to juveniles" is substantially overbroad, because depictions of violence, cruelty and brutality are included within that definition.

Reenacted § 2907.01(E)(4) includes a display, description or representation of the human bodily functions of elimination within the definition of "harmful to juveniles." In *Reno,* the Supreme Court noted that the *Miller* definition of obscenity is limited to "sexual conduct" (anything short of that is constitutionally protected); therefore, the statute in question was unconstitutional because it included within its sweep "excretory activities" and "organs of both a sexual and excretory nature." 521 U.S. at 873, 117 S.Ct. 2329. Accordingly, the Court concludes that § 2907.01(E)(4) criminalizes expression which is fully protected by the First Amendment and that the definition of "harmful to juveniles" is substantially overbroad, because displays, descriptions or representations of the human bodily functions of elimination are included within that definition.

Reenacted § 2907.01(E)(5) includes repeated use of foul language within the definition of "harmful to juveniles." It should go without saying that foul language and profanity enjoy protection under the First Amendment. For instance, the Supreme Court has consistently held that the First Amendment protects the use of profanity directed at police officers unless the speech is " 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest.' " *City of Houston, Texas v. Hill,* 482 U.S. 451, 461—63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)). *Accord, Lewis v. City*

*of New Orleans,* 415 U.S. 130, 132–134, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). *See also, Coy v. Board of Education of the North Canton City Schools,* 205 F.Supp.2d 791 (N.D.Ohio 2002) (holding that board of education violated student's rights under the First Amendment by expelling him because he operated a web site from his parents' home which contained foul language and profanity); *State v. Boomer,* 250 Mich.App. 534, —— N.W.2d —— (2002) (holding that statute which criminalized the use of "vulgar language" was unconstitutional). In *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Supreme affirmed an administrative determination that broadcasting a monologue by George Carlin at 2:00 p.m., which repeatedly used words that one was supposedly not permitted to say on public airwaves, violated a statute which regulated broadcasting. Therein, the Supreme Court did· not suggest that the monologue was not entitled to protection under the First Amendment; rather, its decision rested on the distinctive characteristics of the broadcast medium, as well as the expertise of the agency, and the narrow scope of its order. *Id.* at 748–750, 98 S.Ct. 3026. Unlike the statutes in question in *Pacifica,* the provisions of House Bill No. 8 do not purport to regulate the scarce broadcast medium,[10] nor is the regulation left to an administrative agency with expertise over the area it regulates. Consequently, the Court concludes that § 2907.01(E)(5) criminalizes expression which is fully protected by the First Amendment and that the definition of "harmful to juveniles" is substantially overbroad, because repeated uses of foul language is included within that definition.

Under reenacted § 2907.01(E)(6), the definition of "harmful to juveniles" includes "a display, description or representation in lurid detail of the violent physical torture, dismemberment, destruction or death of a human being." This statutory provision extends far beyond "sexual conduct," the type of speech which may be outlawed in accordance with the *Miller* test, as modified for juveniles in *Ginsberg. Reno,* 521 U.S. at 873, 117 S.Ct. 2329. Moreover, reenacted § 2907.01(E)(6) would make it unlawful for a high school teacher to assign his or her class Wilfred Owen's "Dulce et Decorum Est," with its graphic description of the death of a World War I soldier during a gas attack. A bookseller could go to jail for selling a copy of Shakespeare's *King Lear,* with its detailed acts of mutilation and dismemberment. It would also be unlawful to teach the youth of Ohio about the Holocaust. Consequently, § 2907.01(E)(6) criminalizes expression which is fully protected by the First Amendment, and the Court concludes that the definition of "harmful to juveniles" is substantially overbroad, because that definition contains the matters contained in § 2907.01(E)(6).

Reenacted § 2907.01(E)(7) defines "harmful to juveniles" to include "a display, description or representation of criminal activity that tends to glorify or glamorize the activity, and that, with respect to juveniles, has a dominant tendency to corrupt." In *Eclipse Enterprises, Inc. v. Gulotta,* 134 F.3d 63 (2nd Cir.1997), the Second Circuit concluded that a local ordinance which prohibited the distribution to juveniles of trading cards depicting crimes and criminals violated the First Amendment. Moreover, as the Plaintiffs point out, including reenacted § 2907.01(E)(7) in the definition of "harmful to juveniles" would make it illegal to show a critically acclaimed film such as *The Godfather* to a juvenile. Accordingly, the Court con-

---

**10.** The broadcast medium is scarce, since there are a limited number of frequencies upon which radio and television may be broadcast.

cludes that § 2907.01(E)(7) criminalizes expression which is fully protected by the First Amendment and that the definition of "harmful to juveniles" is substantially overbroad, because displays, descriptions or representations of "criminal activity that tends to glorify or glamorize the activity, and that, with respect to juveniles, has a dominant tendency to corrupt," are included within that definition.

In sum, the statute criminalizes conduct and expression otherwise lawful, as protected by the First Amendment to the United States Constitution. Moreover, the statute as written, because of the overbreadth of reenacted § 2907.01(E), will sweep within its ambit, under the definition of "harmful to juveniles," not only predators, the avowed targets of the legislation, but also publishers, booksellers and others who disseminate materials to juveniles which are fully protected by the First Amendment. Accordingly, the definition of "harmful to juveniles," contained in reenacted § 2907.01(E), is substantially overbroad, in violation of the First Amendment.

 Moreover, the legislation in question violates the First Amendment, because it imposes content-based restrictions and is not narrowly tailored to achieve a compelling state interest. Content-based regulations, as the name implies, restrict speech because of its content. *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Content-neutral regulations, by contrast, are promulgated " 'without reference to the content of the regulated speech.' " *Madsen v. Women's Health Ctr.,* 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). The restrictions on the dissemination, etc., of materials which are "harmful to juveniles" are based upon the content of the materi-

als, since the restrictions are applicable only to materials which come within the definition of "harmful to juveniles," contained in reenacted § 2907.01(E). A content-based restriction on speech is presumptively invalid. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). *See also, City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ("This Court has long held that regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment."). With regard to such restrictions, the Defendants must show that the legislation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The Court finds that the Defendants' stated interest in protecting juveniles from predators on the internet is compelling. *Cf. New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (noting that "[i]t is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling"). However, the Defendants have failed to prove that the legislation is narrowly tailored to achieve that end. Ohio's statutes make it unlawful to disseminate, etc., to juveniles, materials which are "harmful to juveniles," as that term is defined by reenacted § 2907.01(E). Neither that definition nor any other statutory language limits the proscriptions to predators. Material "harmful to juveniles" is not defined as communications between an adult and a juvenile in which the adult "grooms" the juvenile to have sex with him or her. On the contrary, publishers and booksellers who sell books to juveniles which, for instance, glamorize criminals or contain too much foul language will be

legally subject to criminal prosecution, as well.[11]

Moreover, the Court rejects the arguments presented by the Defendants to support the constitutionality of the statute. For instance, the Defendants have argued that the legislation is a "reasonable time, place and manner" restriction on speech. *See* Doc. # 43 at 37. This Court cannot agree. In *Reno*, the Supreme Court concluded that the Communications Decency Act ("CDA"), which made it illegal to transmit "indecent" or "patently offensive" communications to minors over the internet, was overbroad in violation of the First Amendment. In reaching that conclusion, the *Reno* Court rejected the argument of the Government that the CDA was a reasonable time, place and manner regulation of speech, since it was "a content-based restriction on speech, and, as such, cannot be properly analyzed as a form of time,

place and manner regulation." 521 U.S. at 868, 117 S.Ct. 2329 (internal quotation marks and citation omitted). Similarly, the Ohio statutes under consideration constitute a content-based ban on speech which comes within the definition of "harmful to juveniles," contained in reenacted § 2907.01(E). Since it is a content-based restriction, it cannot be analyzed as a reasonable time, place and manner regulation of speech.

■ The Defendants also argue that, since the Plaintiffs have mounted a facial challenge to House Bill No. 8, its constitutionality must be determined in accordance with *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). According to the Defendants, the Plaintiffs must demonstrate, in accordance with *Salerno*, that no set of circumstances exists, under which House Bill No. 8 would be

---

11. The Defendants argue that Ohio's statutes are narrowly tailored, because § 2907.31 can be violated only when a person makes a direct presentation to a known juvenile or group of known juveniles. This Court does not agree with the Defendants' interpretation of Ohio law. The Defendants support that interpretation with *State v. Loshin*, 19 O.O.3d 141 (1980), and *State v. Zeh*, 7 Ohio App.3d 235, 455 N.E.2d 18 (1982). In *Loshin*, a store owner who had displayed in his store a T-shirt and scarf, upon which a four-letter word beginning with "F" had been printed, was prosecuted for presenting material to juveniles which came within the definition of "harmful to juveniles," in violation of § 2907.31. In *Zeh*, the operator of a radio station was prosecuted for violating § 2907.31, for broadcasting a radio performance entitled "Gaydreams." When those prosecutions were commenced, § 2907.31 prohibited furnishing or presenting material to a juvenile which came within the definition of "harmful to juveniles." In each decision, the Hamilton County Court of Appeals interpreted the phrase "present to a juvenile" to mean "a direct presentation to a specific juvenile or group of juveniles as opposed to a presentation to the general public." *Id.* at

237, 455 N.E.2d at 20. Since those cases were decided, § 2907.31 has been amended so that it is unlawful to "[s]ell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile" material which is harmful to a juvenile. Given the inclusion of the additional verbs, this Court cannot conclude that § 2907.31 is limited to direct presentations to known juveniles. Moreover, in § 2907.01(J), as added by House Bill No. 8, the Ohio General Assembly expressly stated that certain computer based communications would be "material," only if directly presented to a specific, known juvenile or group of known juveniles. That language would be surplusage, if § 2907.31 were interpreted, and, thus, the legislative intent was discerned, as prohibiting only direct presentations to a known juvenile or group of known juveniles. However, even if the Defendants' interpretation of § 2907.31 were correct, such an interpretation would not render that definition of "harmful to juveniles," contained in reenacted § 2907.01(E), narrowly tailored, since it would still be unlawful for a bookseller to sell to a known juvenile a book containing paintings of nudes by Titian, Rembrandt or Raphael.

constitutional. This Court does not agree. Therein, the Supreme Court wrote:

A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

*Id.* at 745, 107 S.Ct. 2095 (citation omitted). In the final quoted sentence, the Supreme Court indicated that the First Amendment, with its overbreadth doctrine, was an exception to the rule that a statute is not entirely unconstitutional, even though it may be unconstitutional under certain circumstances. Consequently, *Salerno* does not apply to First Amendment challenges. *Accord Horton v. City of St. Augustine, Florida,* 272 F.3d 1318, 1331 (11th Cir.2001); *National Mining Ass'n v. U.S. Army Corps of Engineers,* 145 F.3d 1399, 1406 (D.C.Cir.1998). Accordingly, the Court rejects the Defendants' assertion that, to prevail, the Plaintiffs must demonstrate that there is no set of circumstances under which House Bill No. 8 is constitutional.

Accordingly, the Court concludes that the Plaintiffs have shown a substantial likelihood of success on the merits of their claim that the definition of "harmful to juveniles," contained in reenacted § 2907.01(E), is substantially overbroad, in violation of the First Amendment.[12]

Given that the Court has so concluded, it is not necessary to decide whether newly enacted § 2907.01(J) is also unconstitutional. Newly enacted § 2907.01(J) merely defines "material," as used in the phrase "material harmful to juveniles." Since the Court enjoins herein the application of statutes which criminalize the dissemination, etc., of materials which are "harmful to juveniles," since the phrase "harmful to juveniles" is overbroad in violation of the First Amendment, it is not necessary to decide whether the definition of "material" is also unconstitutional.

**B. Harm to Plaintiffs in the Absence of a Preliminary Injunction**

 With respect to the question of whether the Plaintiffs will suffer irreparable injury in the absence of a preliminary injunction, the Court notes that the loss of First Amendment rights constitutes an irreparable injury. *See e.g., Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County,* 274 F.3d 377, 400 (6th Cir.2001) (noting that when a preliminary injunction is sought in a case involving the First Amendment, the first factor (i.e., likelihood of success on the merits) will often be determinative, "because the Supreme Court has recognized that even minimal infringement upon First Amendment values constitutes irreparable injury"), *cert. denied,* —— U.S. ——, 122 S.Ct. 1952, 152 L.Ed.2d 855 (2002).

**C. Harm to Others if a Preliminary Injunction is Granted and Balancing the Harm to Plaintiffs if the Injunction is Denied Against the Harm to Others if the Injunction is Granted**

 The Defendants argue that the young people of Ohio will suffer irreparable injury if this Court enters the requested preliminary injunctive relief. In particular, the Defendants argue that the

---

**12.** Accordingly, it is not necessary to decide whether reenacted § 2907.01(E) is also un-

constitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

purpose of House Bill No. 8 is to provide law enforcement with an additional tool to prosecute predators who would utilize the internet to prey upon the children of Ohio. The evidence presented compels this Court to conclude that such irreparable injury is unlikely to occur, if the requested injunctive relief is granted. During the evidentiary hearing, Detective Barlow of the Xenia, Ohio, Police Department testified. Detective Barlow and his partner have been quite successful at apprehending and prosecuting adults who attempt to solicit sex from juveniles in chat rooms on the internet. Their method is to pose as juveniles in such chat rooms and to wait for adult predators to approach them. Detective Barlow testified that he and his partner have arrested over 50 such individuals, each of whom has been successfully prosecuted. The success rate of those prosecutions indicates that the juveniles of Ohio will not be without protection, if the Court enters the requested preliminary injunctive relief. Moreover, although Detective Barlow testified that House Bill No. 8 would give law enforcement an additional tool in its effort to combat predators on the internet, he did not identify a single investigation in which he has been involved (he testified that he has been involved in approximately 5,000 investigations of internet predators) where the provisions of House Bill No. 8 would have made a difference. In other words, Detective Barlow did not testify about a single instance in which the predator could not be prosecuted under current Ohio law, but could have been prosecuted under House Bill No. 8.

In addition, there is a question whether Detective Barlow and other police officers would be able to utilize the provisions of House Bill No. 8, in the manner which they use other statutes to prosecute predators. He testified that adults are frequently prosecuted for violating Ohio's importuning statute, § 2907.07 of the Ohio

Revised Code. The General Assembly amended that statute in 2001, to make it illegal to solicit sex from a law enforcement officer, posing as a young person. In contrast, § 2907.31, which would be utilized to prosecute predators who disseminate, etc., materials to juveniles which come within the definition of "harmful to juveniles," prohibits the dissemination, etc., of such materials to *juveniles*. Unlike § 2907.07, § 2907.31 does not make it unlawful to disseminate, etc., such materials to a law enforcement officer posing as a juvenile.

Accordingly, the Court concludes that the harm the Defendants fear will occur, if the requested preliminary injunctive relief is granted, is unlikely to occur. Given that the Plaintiffs will suffer irreparable injury, if the injunction is not granted, and that it is unlikely that the Defendants will suffer harm if the injunction is granted, the balance of harms strongly favors entering the requested injunction.

### D. Public Interest

Courts have held that the public interest is always served in promoting First Amendment values. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir.2001); *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001); *United Food & Commercial Workers Union*, 163 F.3d at 363. Since First Amendment values will be served by entering a preliminary injunction, the Court concludes that the public interest favors the entry of such relief.

In sum, the Court concludes that three of the relevant factors (substantial likelihood of success on the merits, irreparable injury to the Plaintiffs if a preliminary injunction is not issued and the public interest) favor the entry of a preliminary injunction. Moreover, given that it is unlikely that anyone will suffer an injury if such an injunction is issued, that factor

does not warrant denial of the requested relief. Balancing the four factors, the Court concludes that the Plaintiffs have demonstrated that they are entitled to preliminary injunctive relief. Accordingly, the Court sustains Plaintiffs' Motion for Preliminary Injunction (Doc. # 27). Therefore, the Defendants (other than Governor Taft), their agents, employees and persons acting in concert with them are hereby restrained from prosecuting anyone for violating § 2907.31 and 2907.311, to the extent that such a prosecution arises out of materials which are allegedly "harmful to juveniles." [13]

The Court has considered, but will not require the posting of a bond. *See Moltan Co. v. Eagle–Picher Industries, Inc.,* 55 F.3d 1171, 1176 (6th Cir.1995) (holding that the District Court may waive the requirement that the party obtaining injunctive relief post a bond). The purpose of a bond is to ensure that the enjoined party can recover the monetary damages it suffers, if it is wrongfully enjoined. The Defendants will not suffer such damages, if it is ultimately determined that they were wrongfully restrained from enforcement of the legislation at issue.

Counsel will note that the Court has scheduled a telephone conference call on Tuesday, September 10, 2002, at 8:30 a.m., for the purpose of discussing whether the Defendants will immediately appeal this Decision or whether they will await the entry of final judgment, following a trial upon the merits or upon stipulation.[14]

---

13. Section 2907.31 also proscribes certain activities regarding obscene materials. The Plaintiffs have not argued that this provision is unconstitutional, and the Court does not enjoin the Defendants from enforcing it.

14. If the Defendants decide to delay an appeal until the entry of final judgment following trial, the Court and counsel will, during that conference call, select a trial date and other dates leading to the prompt conclusion of this litigation.