AMERICAN BOOKSELLERS FOUN-
DATION FOR FREE EXPRES-
SION, et al., Plaintiffs,

v.

Ted STRICKLAND,[1] et al., Defendants.

No. 3:02cv210.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 24, 2007.

---

1. When this litigation was initiated, Bob Taft was the Governor of Ohio. He has been succeeded in office by Ted Strickland, whom this Court substitutes Bob Taft, in accordance with Fed.R.Civ.P. 25(d).

Henry Louis Sirkin, Jennifer M. Kinsley, Sirkin Pinales & Schwartz, Cincinnati, OH, J. Michael Murray, Raymond V. Vasvari, Jr., Berkman Gordon Murray & Devan, Cleveland, OH, Michael A. Bamberger, Sonnenschein Nath & Rosenthal LLP, New York, NY, for Plaintiffs.

Betty D. Montgomery, Carol Anne Hamilton O'Brien, Charissa Diane Payer, Elise W. Porter, Ohio Attorney General, Jeffrey Alan Stankunas, Mark David Landes, Isaac Brant Ledman & Teetor, Ronald Joseph O'Brien, Franklin County Prosecutor's Office, Jeffrey Lynn Glasgow, Columbus, OH for Defendants.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. # 86); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 94); JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFFS AND AGAINST DEFENDANTS, PERMANENTLY ENJOINING OHIO REVISED CODE § 2907.31(D)(1), AS APPLIED TO INTERNET COMMUNICATIONS, AND IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFFS ON PLAINTIFFS' CONSTITUTIONAL CHALLENGES TO §§ 2907.01(E) AND 2907.31(D)(2); TERMINATION ENTRY

WALTER HERBERT RICE, District Judge.

Plaintiffs and Defendants have filed cross motions for summary judgment, re-

garding the constitutionality of Ohio Rev. Code §§ 2907.01(E), 2907.31(D)(1) and 2907.31(D)(2), as amended by House Bill 490. Plaintiffs, a group of publishers, distributors, retailers and website distributors, request that this Court enter summary judgment in their favor and permanently enjoin the enforcement of these provisions on the grounds that they are unconstitutionally vague, overbroad and in violation of the First and Fourteenth Amendments to and the Commerce Clause of the United States Constitution. Defendants, the Governor of Ohio, Attorney General of Ohio and prosecuting attorneys from each of Ohio's 88 counties, have filed their own motion seeking summary judgment on the grounds that the above statutory provisions do not violate the First and Fourteenth Amendments and the Commerce Clause. Consequently, the Defendants argue that this Court must deny Plaintiffs' request for an injunction.

I. *BACKGROUND*

A. Procedural

Plaintiffs' instant motion is their second challenge to amendments made to Ohio's "dissemination of material harmful to juveniles" statute, having previously petitioned this Court for a preliminary injunction against amendments made to § 2907.31 by Ohio House Bill 8. Upon enactment of House Bill 8, Plaintiffs immediately commenced a suit challenging these amendments on the grounds that they violated the First and Fourteenth Amendments to and the dormant Commerce Clause of the United States Constitution. In particular, Plaintiffs objected to the definition of "harmful to juveniles" and to the newly enacted "internet provisions."

This Court subsequently sustained Plaintiffs' request for a preliminary injunction, finding that House Bill 8's definition of "harmful to juveniles" violated the First Amendment on several grounds, *Bookfriends, Inc. v. Taft*, 223 F.Supp.2d 932 (S.D.Ohio 2002), concluding that: Section 2907.31, as amended by House Bill 8, criminalized the display of material that is clearly protected speech, such as nudity that is not sexually explicit or extremely violent, and that does not contain human bodily functions of elimination, foul language, dismemberment, torture and the glorification of violence and criminal activity (*id.* at 946); the language in House Bill 8 did not meet the First Amendment's *Miller–Ginsberg* test (*id.* at 946);[2] and the provisions in House Bill 8 failed the strict scrutiny test because its scope reached far beyond its stated purpose of preventing child predators from targeting children on the internet. *Id.* at 949.

Defendants appealed this Court's decision to the Sixth Circuit. However, before the appeal could be heard, the Ohio General Assembly made significant changes to §§ 2907.01 and 2907.31, with House Bill 490. Upon passage of House Bill 490, Defendants moved for an order from the Sixth Circuit to dismiss their appeal and remand the case to this District Court. On June 20, 2003, the Sixth Circuit granted the request. *Bookfriends, Inc. v. Petro*, No. 02–4091 (6th Cir. June 18, 2003),[3] whereupon Plaintiffs amended their complaint to challenge §§ 2907.01(E), 2907.31(D)(1) and 2907.31(D)(2), as amended by House Bill 490. Shortly thereafter, both parties filed cross motions for summary judgment, the subject of this opinion.

**2.** *See Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

**3.** The Sixth Circuit opinion is unreported. It is document # 63 on file.

## B. Factual

### 1. *The Internet and Sexual Predators*

The internet is a network that allows computers to communicate with one another. These communications can consist of one to one communication through the use of e-mail and instant messaging. However, the internet also provides users with the ability to engage in broadcast communication. It permits users to communicate to an unlimited number of people at once, through the use of electronic mailing lists, Usenet news groups, chat rooms and websites on the world wide web. (Prelim. Hr'g Tr. 40–45, 129–135, July 31, 2002).

At the heart of this dispute lies the challenge of how to regulate the internet, a medium of communication that provides its users anonymity. The experts for all parties testified that, at the present time, the nature of the internet makes it virtually impossible to identify the age and geographic location of the sender or the recipient of communications over the internet. (Prelim. Hr'g Tr. 45–46, 147).

Defendants presented compelling evidence that, as a result of the personal and geographic anonymity implicit in internet use, sexual predators are using the internet to prey on child victims. The internet permits sexual predators to easily and repeatedly contact a child in a nonthreatening manner, while simultaneously escaping the notice of parents and law enforcement. (Prelim. Hr'g Tr. 164). Detective Barlow of the City of Xenia Police Department testified that sexual predators use these methods to "groom" children, or condition them to have sexual encounters with adults. (Prelim. Hr'g Tr. 165). Detective Barlow testified that he has been involved in more than 5,000 investigations, regarding the use of the internet by sexual predators to target children, leading to over 50 arrests. (Prelim. Hr'g Tr. 164). Additionally, he testified that the internet provides sexual predators with a larger pool of potential victims, with access to children throughout the United States. Thus, the incidence of "travelers," persons who will travel long distances to engage in sexual intercourse with children, has increased. *Id.* at 164.

### 2. *House Bill 490 Amendments*

The Ohio Assembly passed House Bill 490, amending provisions prohibiting "disseminating matter harmful to juveniles." Defendants assert that the purpose of such amendments was to prohibit the use of the internet by pedophiles in the "grooming" of child victims. (Defs. Mem. in Supp. of Defs. Mot. for Summ. J. 25).

Section 2907.31(A), which sets forth a general prohibition against exposure of harmful matter to juveniles, provides in pertinent part:

(A) No person, with knowledge of its character or content, shall recklessly do any of the following:

(1) Directly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles any material or performance that is obscene or harmful to juveniles;

(2) Directly offer or agree to sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles any material or performance that is obscene or harmful to juveniles....

As amended by House Bill 490, the phrase "harmful to juveniles" is defined by § 2907.01(E) of the Ohio Revised Code as:

(E) "Harmful to juveniles" means that quality of any material or performance describing or representing nudity, sexual conduct, sexual excitement, or sado-

masochistic abuse in any form to which all of the following apply:

(1) The material or performance, when considered as a whole, appeals to the prurient interest of juveniles in sex.

(2) The material or performance is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for juveniles.

(3) The material or performance, when considered as a whole, lacks serious literary, artistic, political, and scientific value for juveniles.

House Bill 490 also amended two other provisions, dubbed by Plaintiffs as the "internet provisions," the first of which provides:

(D)(1) A person directly sells, delivers, furnishes, disseminates, provides, exhibits, rents, or presents or directly offers or agrees to sell, deliver, furnish, disseminate, provide, exhibit, rent, or present material or a performance to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles in violation of this section by means of an electronic method of remotely transmitting information if the person knows or has reason to believe that the person receiving the information is a juvenile or the group of persons receiving the information are juveniles.

Ohio Rev.Code § 2907.31(D)(1). In an apparent effort to limit the scope of that statutory provision, the Ohio legislature drafted the "broadcast communications" exception, set forth in § 2907.31(D)(2), which states that a person "remotely transmitting information by means of a method of mass distribution" does not violate § 2907.31, if either of the following applies:

(a) The person has inadequate information to know or have reason to believe

that a particular recipient of the information or offer is a juvenile

(b) The method of mass distribution does not provide the person the ability to prevent a particular recipient from receiving the information.

Plaintiffs have filed a motion for summary judgment (Doc. # 86), seeking a permanent injunction, contending that §§ 2907.01(E) and 2907.31(D), as amended by House Bill 490, are unconstitutionally vague; that § 2907.31(D)(1), as amended by Bill 490, violates the First Amendment on the grounds that it is overbroad, as restricting adults from engaging in protected speech on the internet and failing the strict scrutiny test; that the amended provisions are unconstitutional, under the commerce clause, as they regulate speech that occurs wholly outside the borders of Ohio, imposes an unjustifiable burden on interstate commerce; and, finally, that regulation of the internet is the exclusive right of the Federal government.

Defendants have filed a cross motion for summary judgment (Doc. # 94), based upon the contentions that §§ 2907.01(E) and 2907.31(D)(1), as amended by House Bill 490, are not unconstitutionally vague and overbroad, adequately protect First Amendment rights, and do not violate the Commerce Clause, since the amendments do not regulate commerce. In part, Defendants argue that § 2907.31(D)(1) does not violate the First Amendment, because § 2907.31(D)(2) narrows its application. Accordingly, Defendants contend that Plaintiffs are not entitled to permanent injunctive relief.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-

finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment....."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### B. Standing

Plaintiffs have not expressly articulated their standing in their motion for summary judgment with respect to the House Bill 490 amendments, nor do Defendants directly challenge Plaintiffs' standing. This Court is under an obligation to verify its subject matter jurisdiction over a particular case. *In re Troutman*, 286 F.3d 359, 364 (6th Cir.2002); *see also Courtney v. Smith*, 297 F.3d 455 (6th Cir.2002). The Constitution of the United States limits the subject matter jurisdiction of this Court to cases and controversies. U.S. Const. art. III, § 2, cl. 1; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

One of the factors in determining whether a dispute is a case or controversy is whether a plaintiff has standing. *Lujan*, 504 U.S. at 559, 112 S.Ct. 2130.

█ In order to have standing:
(1) the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,' not conjectural or hypothetical, (2) there must be a causal connection between the injury and the conduct complained [of]-the injury has to be 'fairly ... traceable to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court' ..., and (3) it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision.

*Zurich Insurance Company v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir.2002). In seeking an injunction of a criminal statute, standing exists when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

█ Plaintiffs, with members who sell products online, including the National Association of Recording Merchandisers ("NARM"), American Booksellers Foundation for Free Expression ("ABFFE") and the Association of American Publishers, Inc, ("AAP"), have standing in this case. Plaintiffs' second amended complaint states that NARM's members sell sound recordings on the internet. ABFFE and AAP represent members who sell books

and other materials online. Plaintiffs' Second Amended Complaint at 31–33. As discussed below, the direct sale of merchandise on the internet falls within the type of communication proscribed in § 2907.31(D)(1), and all three Plaintiffs engage in conduct which falls within the scope of that prohibited by § 2907.31. Therefore, NARM, AAP and ABFFE all engage in "a course of conduct arguably affected with a constitutional interest, but proscribed by a statute."

 In a facial challenge with multiple plaintiffs, only one plaintiff need demonstrate standing. Once a plaintiff has done so, the District Court need not consider whether the other plaintiffs also have standing. *See e.g., Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *Save Our Heritage v. F.A.A.,* 269 F.3d 49, 55 (1st Cir.2001); *Kelley v. Selin,* 42 F.3d 1501, 1510 (6th Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995). Accordingly, this Court does not consider the question of whether any of the other Plaintiffs has standing.

## III. *FIRST AMENDMENT: OVERBREADTH AND STRICT SCRUTINY ANALYSIS*

Plaintiffs argue that § 2907.31(D)(1) is overbroad and fails the strict scrutiny test. Defendants disagree, arguing that the House Bill 490 amendments are not overbroad, because the definition of "harmful to juveniles" meets the constitutional requirements of the *Miller–Ginsberg* test and because § 2907.31(D)(2) sufficiently narrows the scope of § 2907.31(D)(1) to the point it passes constitutional muster. Defendants also assert that the strict scrutiny test does not apply herein because Plaintiffs do not have "traditional" standing. (Defs. Mem. in Reply to Pls. Mem. in Opp: to Defs. Mot. 4–6).

### A. Overbreadth

In *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Plaintiff instituted a facial challenge to the Bail Reform Act of 1984. In its decision, the Supreme Court warned that "a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully" and held that a court must uphold a statute unless a plaintiff can "establish that no set of circumstances exists under which the [law] would be valid." *Id.* at 745, 107 S.Ct. 2095. Emphasizing this high burden, the Court wrote, "the fact that [the law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.* However, in *Salerno,* the Supreme Court indicated that the overbreadth doctrine, rather than that decision, controlled in the context of a facial challenge predicated upon the alleged deprivation of First Amendment rights. *Id.*

 Under the overbreadth doctrine, a statute is unconstitutionally overbroad when its scope is so broad that it penalizes a substantial amount of protected speech in an attempt to regulate that which is unprotected. *Lewis v. City of New Orleans,* 415 U.S. 130, 132, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *see also Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Plummer v. City of Columbus, Ohio,* 414 U.S. 2, 94 S.Ct. 17, 38 L.Ed.2d 3 (1973); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). In *Lewis,* the Supreme Court invalidated a Louisiana criminal statute which prohibited persons from "curs[ing] or revil[ing] or us[ing] obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." *Lewis,* 415 U.S. at 132, 94 S.Ct. 970. The Court reasoned that while "fighting words"

are not constitutionally protected speech, the statute in question reached beyond fighting words and criminalized protected speech. *Id.* at 132, 94 S.Ct. 970. Likewise, in attempting to regulate unprotected speech to juveniles, this Court concludes, as is explained below, that § 2907.31(D)(1) restricts protected speech as to adults.

■ Plaintiffs argue that § 2907.31(D)(1) is overbroad because it bans protected speech between adults, and that § 2907.01(E) is overbroad because it applies a "community standard" in determining whether material is "harmful to juveniles." Defendants' response is twofold. First, they argue that the House Bill 490 amendments are not overbroad since the definition of "harmful to juveniles," as set forth in § 2907.01(E), is sufficiently narrow to comply with the *Miller–Ginsberg* standard, and, second, that § 2907.31(D)(1) is not overbroad, because its scope is sufficiently narrowed by § 2907.31(D)(2) to prevent it from regulating protected speech to and between adults. As a means of analysis, the Court will initially discuss the parties' arguments pertaining to the definition of "harmful to juveniles," following which it will turn to their contentions concerning the constitutionality of § 2907.31(D)(1) under the First Amendment.

For reasons which follow, this Court agrees with Defendants' assertion that § 2907.01(E) defines material "harmful to juveniles" in conformity with the *Miller–Ginsberg* standard. Therefore, the Court concludes that this statutory provision does not violate the First Amendment. That standard was developed by the Supreme Court to determine what speech was unlawful as to minors. It is the product of two Supreme Court decisions, *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

In *Miller v. California*, the Supreme Court set out basic guidelines for the regulation of obscene, unprotected speech for adults. In order to be such, the speech must fall within the following guidelines:

(1) whether, the average person, applying contemporary community standards would find that the work appeals to the prurient interest;

(2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(3) whether the work taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24, 93 S.Ct. 2607.

Prior to the ruling in *Miller*, the Supreme Court addressed the boundaries of protected speech and obscenity as to juveniles in *Ginsberg*, when it upheld a criminal statute which made it unlawful to sell material "harmful to minors" to persons under 17 years of age. The New York Statute defined material harmful to minors as follows:

that quality of … representation … of nudity … [which] …

(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and

(ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

(iii) is utterly without redeeming social importance for minors.

*Ginsberg*, 390 U.S. at 633, 88 S.Ct. 1274. In order to conform *Ginsberg* with the later ruling of *Miller*, the Supreme Court has adopted the first two prongs of the *Ginsberg* test and the third prong of the *Miller* test, as an appropriate standard to

define obscene speech as to minors. *See Ashcroft v. ACLU*, 535 U.S. 564, 570, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002); *Reno v. ACLU*, 521 U.S. 844, 864, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).[4] The first two prongs of the *Miller* test are revised under the *Miller–Ginsberg* standard, so that the focus is upon what appeals to the prurient interest of or is patently offensive for minors, rather than for adults. Therefore, under the *Miller–Ginsberg* standard, a greater universe of material is unprotected by the First Amendment, than under the *Miller* test, alone, or to phrase it conversely, protected speech for minors is narrower in scope than protected speech for adults. Herein, a comparison of the three prongs of the *Miller–Ginsberg* test to the three prongs of the test set forth in § 2907.01(E) leads to the conclusion that the Ohio statute meets the three prongs of the test adopted by the Supreme Court in those decisions.

■ Having concluded that § 2907.01(E) does not violate the First Amendment, the Court turns to the constitutionality of § 2907.31(D)(1), which states that a person "directly sells ..., disseminates ..., presents ..., or directly offers to sell to a juvenile in violation of [ § 2901.31(A) ] by means of an electronic method of remotely transmitting information if the person knows or has reason to believe that the person receiving the information is a juvenile." Defendants argue that, since § 2907.01(E) meets the *Miller–Ginsberg* test, the amended version of § 2907.31(D)(1) must meet constitutional muster, because the § 2907.01(E) definition of "harmful to juveniles" properly indicates what is unprotected speech

as to minors and § 2907.31(D)(1) only prohibits the sending of material harmful to juveniles when the sender knows the recipient is a juvenile. Plaintiffs, in contrast, contend that the effect of this statutory section is to apply the broadly construed restrictions for juveniles to adults. For reasons with follow, this Court agrees with Plaintiffs, given that, notwithstanding the compliance of § 2907.01(E) with the *Miller–Ginsberg* test, the application of § 2907.31(D)(1) will unconstitutionally restrict protected speech between adults.

In reviewing statutes similar to the one in question, the Supreme Court has cautioned that the "governmental interest in protecting children from harmful material ... does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno*, 521 U.S. at 875, 117 S.Ct. 2329. In *Reno*, the Supreme Court reviewed the constitutionality of a statute with a similar provision. The Communications Decency Act (CDA) provided that a person was guilty of transmitting indecent messages to a minor if he did it "knowing" that the recipient was under 18 years old. *Id.* at 859, 117 S.Ct. 2329. The Supreme Court ruled that in light of the ease with which the internet is accessed and in light of the absence of viable age verification technology, the "knowing" standard would interfere with adult-adult communication, since any internet user is put on notice that the recipient may be a juvenile. *Id.* at 876, 117 S.Ct. 2329. *See also, Ashcroft v. Free Speech Coalition*, 535 U.S. at 252, 122 S.Ct. 1389 (holding that "speech within the rights of adults to hear may not be silenced completely in an attempt to shield

4. The three-part *Miller–Ginsberg* test examines: 1) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest of minors; 2) whether the work depicts or describes, in a patently offensive way to prevailing standards in the

adult community as a whole with respect to what is suitable material for minors, sexual conduct specifically defined by the applicable state law; and 3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

children from it"). This Court concludes that the enactment of § 2907.31(D)(1) has done just this. The Supreme Court has consistently held that, as to adults, "sexual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications of California, Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

Section 2907.31(D)(1) would act as a ban to that segment of speech between adults which is protected by the First Amendment, even though that speech is unprotected as to juveniles. Defendants in the instant case assert that the limiting provisions of § 2907.31(D)(2) address the objections in *Reno,* because a person is not in violation of § 2907.31(D)(1) when remotely transmitting information by means of a method of mass distribution if "a person has inadequate information to know or have reason to believe that a particular recipient of the information or offer is a juvenile" or "the method of mass distribution does not provide the person the ability to prevent a particular recipient from receiving the information." This Court is not persuaded by Defendants' argument. Although § 2907.31(D)(2) may act to limit the scope of this statute, § 2907.31(D)(1) is still overbroad and infringes on constitutionally protected adult-adult speech. The limiting provisions do not extend to one-to-one methods of communication in places such as chat rooms. According to the Court in *Reno,* every user of the internet has reason to know that some participants in chat rooms are minors. An adult would have no way of ensuring that her communications in a chat room would be between and among other adults alone. There is simply no means, under existing technology, to restrict conversations in a chat room to adults, only. Consequently, an adult sending a one-to-one message which is unprotected as to minors under the *Miller–Ginsberg* standard, but protected as to adults under the standard in *Miller,* will

be liable under § 2907.31(D)(1). Therefore, the provision is overbroad.

Moreover, other federal courts have reached the same conclusion, when addressing the constitutionality of statutes that restricted communications between adults on the internet in an effort to shield minors from materials which are harmful to juveniles. For instance, in *American Booksellers Foundation v. Dean,* 342 F.3d 96 (2d Cir.2003), the Second Circuit held that a Vermont statute, which criminalized distributing to minors over the internet, materials which were "harmful to juveniles," was overbroad in violation of the First Amendment, because the statute, like § 2907.31(D)(1), criminalized substantial, protected speech between adults. *Id.* at 101–02. Similarly, in *American Civil Liberties Union v. Johnson,* 194 F.3d 1149 (10th Cir.1999), the Tenth Circuit reached the same conclusion with respect to the constitutionality of a New Mexico statute which criminalized disseminating by computer material "harmful to a minor," because that statute, as a practical manner, outlawed a substantial amount of protected speech between adults.

No matter the subjective intent of a chat room participant and regardless of whether he or she meant to communicate with juveniles, if a minor is in the chat room, the participant could be prosecuted under the statute in question, even though the conversation was intended only for adults and was protected vis a vis adults. Since the limiting provision of the statute would not prevent such a result and that result would violate the First Amendment, as interpreted by the Supreme Court in *Reno,* this Court concludes that § 2907.31(D)(2) does not sufficiently narrow subsection (D)(1) to save it from a challenge under the overbreadth doctrine.

Accordingly, this Court concludes that § 2907.31(D)(1) is overbroad in violation of the First Amendment.

### B. Strict Scrutiny

According to the Plaintiffs, § 2907.31(D)(1) fails the strict scrutiny test applied to statutes which regulate speech based upon its content. Defendants, in contrast, contend that application of the strict scrutiny test is not appropriate herein, because Plaintiffs lack traditional standing. In the alternative, they argue that if the strict scrutiny test does apply, the House Bill 490 amendments pass the test because they conform to the *Miller–Ginsberg* standard, and are sufficiently narrow as they exclude communication made via "methods of mass communication." (Dfs. Mem. in Supp. of Dfs. Mot. for Summ. J. 24–25).

Section 2907.31(D)(1), as amended by House Bill 490, criminalizes protected speech between adults, based upon the content of their speech. Therefore, that statute is a content based restriction of protected speech. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Section 2907.31, as amended by the House Bill 490, is a content based restriction, because it attempts to restrict the dissemination of material to juveniles based on the content of the speech. *Bookfriends, Inc.,* 223 F.Supp.2d at 949. For reasons set forth above, this Court has concluded that Ohio has regulated protected speech between adults, through the application of § 2907.31(D)(1) and the constitutionally sanctioned definition of "harmful to juveniles," contained in § 2907.01(E), thus proscribing speech which is protected by the First Amendment when used between adults.

A content-based restriction is presumptively invalid. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *see also, City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ("This Court has long held that regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment."). Such regulation of protected speech will be upheld only where the State demonstrates that the limitation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). For reasons which follow, this Court concludes that, although Defendants assert a compelling government interest, the House Bill 490 amendments are not narrowly defined to meet that objective.

Defendants contend that the strict scrutiny analysis is inapplicable to a review of the House Bill 490 amendments because Plaintiffs lack traditional standing. Citing the Supreme Court's decision in *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), Defendants state that where Plaintiffs lack traditional standing in a First Amendment challenge, they can only raise an overbreadth challenge. *Id.* at 612, 93 S.Ct. 2908. This Court rejects that assertion, because, as stated above, at least one of the Plaintiffs in this case does have traditional standing. Therefore, the Plaintiffs can launch both an overbreadth and a strict scrutiny attack on § 2907.31(D)(1).

Defendants state that the purpose of the House Bill 490 amendments is to "intercept the activity of sexual predators aiming to lure children into sexual encounters ...". Undoubtedly, this is a compelling government interest. *See New York*

*v. Ferber,* 458 U.S. 747, 756–757, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (interest in "safeguarding the physical and psychological well-being of a minor" is compelling). However, Ohio has failed to demonstrate that § 2907.31(D)(1) is narrowly tailored to achieve this compelling interest. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby, v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). Defendants raise several arguments to prove that § 2907.31(D)(1) is so tailored, stating that the House Bill 490 amendments are narrowly tailored because they allow for alternate methods of communication to one-to-one communications and regulate only a narrow category of protected speech and are necessary, because there is not sufficient filtering software to block minors access to harmful material on the internet. Taking these arguments to be true, the Ohio statute is not sufficiently narrowly drawn to pass the strict scrutiny test. This is best demonstrated by examining state court decisions in which state statutes, which criminalized computer communications with juveniles, were held to be constitutional under strict scrutiny analysis.

For instance, in *People v. Foley,* 94 N.Y.2d 668, 731 N.E.2d 123, 709 N.Y.S.2d 467 (N.Y.2000), the Court of Appeals of New York upheld a New York statute which prohibited a person from:

> intentionally use[ing] any computer communication system . . . to initiate or engage in such communication with a person who is a minor; *and* . . . By means of such communication he importunes, invites or induces a minor to engage in sexual intercourse, deviate sexual inter-

course, or sexual contact with him, or to engage in a sexual performance, obscene sexual performance, or sexual conduct for his benefit.

*Id.* at 676, 731 N.E.2d at 127, 709 N.Y.S.2d at 471 [emphasis added]. The New York court focused on two factors when it ruled that the statute passed strict scrutiny. First, a person was not criminally liable under the statute unless the speech fell within the bounds set forth in the *Miller–Ginsberg* standard, and, secondly, the statute limited application to those who intended to induce minors into sexual activity. *Id.* at 682–683, 731 N.E.2d at 131–132, 709 N.Y.S.2d at 475–476. The statute survived strict scrutiny, because it attempted to regulate conduct by restricting speech that was part of the "evil" sought to be prevented, and was narrowly tailored to achieve the state's objective of preventing predators from using the internet to victimize children.

In addition, in *People v. Hsu,* 82 Cal. App.4th 976, 988–989, 99 Cal.Rptr.2d 184, 194 (Cal.Ct.App.2000), a California appellate court similarly held that a statute which required a double intent, first, an intent to display harmful material to children and, second, with the intent of seducing them was not overbroad for purposes of First Amendment analysis. It targeted only those who intended to prey on minors and therefore left protected adult-to-adult communication unregulated. *Id.* at 988, 99 Cal.Rptr.2d at 194.

Herein, § 2907.31(D)(1) and its related provisions do not limit the scope of the statute to those disseminating material harmful to juveniles with the intent to induce children into sexual activity.[5] The double intent requirement is but one ex-

---

**5.** Section 2907.31(D)(1) provides:

(D)(1) A person directly sells, delivers, furnishes, disseminates, provides, exhibits, rents, or presents or directly offers or agrees to sell, deliver, furnish, disseminate,

provide, exhibit, rent, or present material or a performance to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles in violation of

ample of how the statute could have been drafted more narrowly than its present form. The State has failed to prove that § 2907.31(D)(1), as applied to internet communications, was both necessary and narrowly tailored to serve the compelling governmental interest of protecting minors from pedophiles on the internet. Moreover, in *Dean, supra,* the Second Circuit held that the Vermont statute, similar to § 2907.31(D)(1), was not narrowly tailored to meet the statutory goal of preventing pedophiles from "grooming" minors, since that goal could be met by enforcing the state statute which outlawed luring. 342 F.3d at 102. Similarly, herein, the State of Ohio can achieve the same goal by enforcing its importuning statute (Ohio Rev.Code § 2907.07), which it has done numerous times in internet sting operations.[6] *See also, PSINet v. Chapman,* 362 F.3d 227 (4th Cir.2004) (holding that West Virginia statute outlawing the dissemination of materials over the internet that are harmful to juveniles was not narrowly tailored).

Accordingly, the Court concludes that § 2907.31(D)(1) violates the strict scrutiny test of the First Amendment.

Based upon the foregoing, this Court concludes that § 2907.31(D)(1), even limited by subsection (D)(2) thereof, violates the First Amendment, while § 2907.01(E) does not.

## IV. *VOID FOR VAGUENESS ANALYSIS*

Plaintiffs claim that several words and phrases in the House Bill 490 amendments are unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment. This Court does not agree. As a means of analysis, the Court initially reviews the legal standards it must apply when deciding whether a statute is unconstitutionally vague.

Due process requires that a statute be drafted in a manner that provides the public with fair notice or warning of the proscribed behavior and in a manner that provides guidance to law enforcement officials and triers of fact, so as to prevent arbitrary and discriminatory application and enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Failure to meet either prong of this standard renders a regulation void for vagueness. The courts will pay even closer attention when, as in the instant case, a statute attempts to restrict an area of free expression through the penal code, because the threat of punitive penalties has the potential to significantly chill speech. *Ashton v. Kentucky,* 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1996); *see also Reno, supra.*

There is disagreement as to whether *Salerno* applies to facial challenges of statutes affecting First Amendment rights on vagueness grounds. As stated earlier, typically, a facial challenge to a statute requires that the challenger demonstrate that the statute is invalid in all its applications. *Salerno,* 481 U.S. at 745, 107 S.Ct.

---

this section by means of an electronic method of remotely transmitting information if the person knows or has reason to believe that the person receiving the information is a juvenile or the group of persons receiving the information are juveniles.

6. This Court rejects the Defendants' assertion that Ohio's importuning statute will not prevent grooming of minors over the internet, given that the argument is belied by the success of many law enforcement officers throughout Ohio. However, even if the Defendants' assertion in that regard was correct, they have failed to suggest why the alleged shortcomings of that statute could not be eliminated through amendment, while avoiding criminalizing protected speech over the internet between adults.

2095. However, where regulation of protected speech is involved, the *Salerno* doctrine is not applied. *Id.* at 745, 107 S.Ct. 2095. In *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1982), the Supreme Court invalidated a California penal statute which required "persons who loiter[s] or wander[s] on the streets to provide a 'credible and reliable' identification and to account for their presence when requested by a peace officer." *Id.* at 353, 103 S.Ct. 1855. The Court indicated that because the California statute had the potential to infringe on First Amendment rights and the seriousness of the criminal sanctions, the Court could find the statute invalid, even if the Court determined that there did exist a valid application. *Id.* at 358 n. 8, 103 S.Ct. 1855; *see also City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)(in dicta, declining to apply *Salerno* in void for vagueness claims related to First Amendment rights).

Defendants admit that there is mixed authority as to whether *Salerno* should be applied, citing to a recent Sixth Circuit decision applying *Salerno* to its vagueness analysis in a First Amendment context. *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 262 F.3d 543, 555 (6th Cir.2001). However, applying the less rigorous standard than that set forth in *Salerno,* to Plaintiffs' void for vagueness challenges, causes this Court to conclude the statutes in question pass muster under the Due Process Clause of the Fourteenth Amendment.

■ The test for vagueness is whether the statute's language can be understood by a person of normal understanding. If the language, when measured by common understanding and practices, causes people of common intelligence to guess as to its meaning, the statute is void. *Keyishian v. Board of Regents of University of State of New York,* 385 U.S. 589, 604, 87 S.Ct. 675,

17 L.Ed.2d 629 (1967); *Cramp v. Board of Public Instruction of Orange County Florida,* 368 U.S. 278, 280, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). Applying these standards, this Court concludes that §§ 2907.31(D)(1), 2907.31(D)(2) and 2907.01(E) are not vague.

■ Plaintiffs raise challenges to four words or phrases in §§ 2907.31(D)(1) and (2) and 2907.01(E), claiming that they are unconstitutionally vague. First, they claim that the phrase "a method of mass distribution," in the limiting provision of § 2907.31(D)(2), is unconstitutionally vague on the grounds that it is not defined or used elsewhere in the Ohio Revised Code. Defendants respond that the phrase "a method of mass distribution" should be interpreted according to its common usage. Using the dictionary to define each word, the Defendants define the phrase as "a procedure or technique for delivering information to a large number of individuals." Defendants argue that the phrase could mean "mass mailings, leafleting in the park, publishing a newsletter or book, announcing something on a public address system, telephone calls, the mail, writing letters to the editor, placing ads in the newspaper, TV and radio broadcasts and passing notes in English class."

Although this Court does not agree with some of the examples Defendants have set forth, the Court finds that Plaintiffs have not demonstrated that the term is vague in a substantial amount of its applications. While the phrase could have been better drafted or defined, perhaps by eliminating or defining subjective terms such as "mass," this alone does not render it vague. In this Court's opinion, a person of common intelligence could determine the meaning of a "method of mass distribution."

■ Second, Plaintiffs contend that the use in § 2907.31(D)(1) of the word "re-

motely," in the phrases "by means of an electronic method of remotely transmitting information" and "remotely transmitting information by means of methods of mass distribution," is vague, given that all electronic transmission is remote. Defendants respond that the "remotely" provisions were inserted to distinguish § 2907.31(D)(1) from § 2907.31(A)(3), a provision prohibiting a person from allowing a juvenile "to peruse or view material or performances harmful to juveniles while in physical proximity of the juvenile." Given that "remotely" is a common word readily understood, the Court concludes that it is not vague, even if, as Plaintiffs implicitly argue, its inclusion in § 2907.31(D)(1) is not strictly necessary.

Third, Plaintiffs argue that the word "ability" in the phrase "ability to prevent a particular recipient from receiving the information" is vague because it does not specify whether this refers to the "financial, technological or physical" ability. Defendants do not address this challenge. "Ability" is a word in common usage in law and life; therefore, § 2907.31(D) is not unconstitutionally vague, because it contains that word.

Fourth, Plaintiffs challenge the phrase "patently offensive to prevailing standards in the adult community with respect to what is suitable for juveniles," in § 2907.01(E), on the basis that the inclusion of a community standard makes the provision vague. Plaintiffs base their argument on *Reno, supra*, striking down the Communications Decency Act (CDA) for vagueness. Plaintiffs' reliance on *Reno* is misplaced, because the CDA is not analogous to the statute in question. In *Reno*, the Supreme Court struck down the CDA as unconstitutionally vague and overbroad, because the scope of restricted speech was not defined or limited by the three prongs set forth in the *Miller–Ginsberg* test. While the CDA did include "community standards" in determining indecency pursuant to the second prong of *Miller–Ginsberg*, the *Reno* Court did not find the statute vague and overbroad on that ground; rather, the CDA was invalidated because it had no provisions comparable to the first and third prongs of the *Miller–Ginsberg* test (*i.e.*, whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest of minors (first prong); and whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value (third prong)). In addition, it omitted the "specifically defined by the applicable state law" limitation, a critical element of the second prong of the *Miller–Ginsberg* test. 521 U.S. at 871–73, 117 S.Ct. 2329. Moreover, the Supreme Court addressed a federal statute containing the phrase "patently offensive to prevailing standards in the adult community with respect to what is suitable for juveniles," in an attempt to restrict the dissemination of harmful material to minors over the internet. *Ashcroft, supra*. In *Ashcroft*, the Supreme Court reviewed a challenge to the Child Online Protection Act (COPA), ruling that reliance on "community standards" in the first and second prong of the *Miller–Ginsberg* test was valid, even when dealing with a statute which regulated speech on the internet. 535 U.S. at 578, 122 S.Ct. 1700. Accordingly, this Court concludes that the phrase "patently offensive to prevailing standards in the adult community with respect to what is suitable for juveniles" in § 2907.01(E) is not unconstitutionally vague.

## V. COMMERCE CLAUSE

The Commerce Clause gives Congress the "power ... [to] regulate Commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. This affirmative assignment of power implies a limita-

tion on the power of states to regulate conduct constituting interstate commerce. *Gibbons v. Ogden,* 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824). Under the Commerce Clause, a state statute is per se invalid when it "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests". *McNeilus Truck & Mfg., Inc. v. State ex rel. Montgomery,* 226 F.3d 429, 442 (6th Cir.2000)(citing *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475(1978)). Absent direct regulation or discrimination against interstate commerce, a state statute will be upheld "where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). In balancing the burden versus benefit, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* at 142, 90 S.Ct. 844.

Defendants ask this Court to forgo a Commerce Clause analysis, arguing that § 2907.31 does not regulate commerce, analogizing § 2907.31(D)(1) to the criminal statute at issue in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and claiming that the scope of § 2907.31(D)(1) contains no nexus to commerce as it does not seek to regulate commercial actors or commercial conduct. Defendants also cite *Foley,* 94 N.Y.2d 668, 731 N.E.2d 123, 709 N.Y.S.2d 467 (N.Y. 2000), in claiming that § 2907.31(D)(1) does not regulate any legitimate commerce. This Court rejects Defendants' arguments and finds their reliance on *Lopez* and *Foley* to be misplaced.

The statute at issue in *Lopez* was the Gun–Free School Zones Act of 1990, a federal criminal statute prohibiting the possession of a firearm in a school zone. The Supreme Court ruled that the statute was outside the scope of Congress's power to regulate commerce, because the conduct that was regulated was not such. *United States v. Lopez,* 514 U.S. 549, 567, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). One factor considered by the Court in reaching its decision was that the statute on its face and in its terms had nothing to do with commerce. *Id.* at 561, 115 S.Ct. 1624. However, even though the statute did not pertain to commerce, the Supreme Court nevertheless concluded that it's enactment exceeded the authority given to Congress by the Commerce Clause. Moreover, unlike the statute at issue in *Lopez,* the wording of § 2907.31(D)(1) attempts to regulate commercial conduct. A facial review of the language of the provision is demonstrative. Section 2907.31(D)(1) prohibits a person from "directly sell[ing] ..., deliver[ing] ..., [or] rent[ing] to a juvenile ... any material that is obscene or harmful to juveniles." The statute is violated when a person conducts such activity "by an electronic method of remotely transmitting information." This includes the internet. Since § 2907.31(D)(1), by its terms, regulates commerce, it is, therefore, distinguishable from the statute in *Lopez.*

Defendants' reliance on *Foley* is likewise unavailing. The statute in question in *Foley* criminalized the intentional sending of any computer communication to engage in such communication with a minor with the intent to importune or invite that minor to engage in sexual intercourse. *Foley,* 94 N.Y.2d at 676, 731 N.E.2d at 127, 709 N.Y.S.2d at 471 (citing N.Y. PENAL LAW § 235.22(Consol.2000)). This statute regulated the use of computer communications to invite sexual intercourse with a minor. The New York court stated:

We are hard pressed to ascertain any legitimate commerce that is derived from the intentional transmission of sexually graphic images to minors for the purpose of luring them into sexual activity. Indeed, the conduct sought to be sanctioned by Penal Law § 235.22 is of the sort that deserves no "economic" protection. Thus, we conclude that Penal Law § 235.22 is a valid exercise of the State's general police powers. (Citations omitted).

*Id.* at 684, 731 N.E.2d at 133, 709 N.Y.S.2d at 477.

Section 2907.31(D)(1) is distinguishable from the statute in *Foley,* as it seeks to regulate the sale and distribution of communication, thus, by its terms, a regulation of commercial activity.

Defendants next argue that if a Commerce Clause analysis is required, this Court must apply the *Salerno* doctrine and deny Plaintiffs' motion. Plaintiffs counter that the *Salerno* standard does not apply to their facial commerce clause challenge.[7] This Court concludes that the *Salerno* doctrine is applicable to the Plaintiffs' Commerce Clause challenge, because those federal appellate courts addressing the issue have utilized *Salerno* in facial challenges to state statutes based on such grounds.[8] Moreover, the Supreme Court has carved out only two very narrow exceptions to the *Salerno* doctrine. As stated above, in the *Salerno* decision, the Supreme Court had stated that it never intended for *Salerno* to apply to facial challenges on First Amendment grounds. 481 U.S. at 745, 107 S.Ct. 2095. Since *Salerno,* the Supreme court has carved out only one other exception, facial challenges to abortion statutes. In *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court applied an "undue burden" standard in the context of these matters. *See also Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 193 (6th cir.1997). Plaintiffs' current claims do not fall into either exception, and this Court can find no authority indicating that the Supreme Court has excepted facial challenges on Commerce Clause grounds from the *Salerno* doctrine.

Plaintiffs cite several trial and appellate courts that have not applied *Salerno* when reviewing facial challenges to statutes, similar to § 2907.31, on Commerce Clause grounds, to wit: *American Booksellers Foundation For Free Expression v. Dean,* 202 F.Supp.2d 300 (D.Vt.2002), *aff'd in part modified in part,* 342 F.3d 96 (2nd Cir.2003); *PSINET v. Chapman,* 167 F.Supp.2d 878 (W.D.Va.2001), *aff'd,* 362 F.3d 227 (4th Cir.2004); *ACLU v. Johnson,* 194 F.3d 1149, (10th Cir.1999); *Cyberspace Comms., Inc. v. Engler,* 55 F.Supp.2d 737 (E.D.Mich.1999), *aff'd,* 238 F.3d 420 (6th Cir.Mich.2000); *American Libraries Ass'n v. Pataki,* 969 F.Supp. 160 (S.D.N.Y.1997), without providing any fur-

---

**7.** Plaintiffs do not claim that they are raising an as-applied challenge to § 2907.31(D)(1). They filed their motion before the effective date of House Bill 490. Therefore, their claim is a facial challenge.

**8.** *See United States v. Lopez,* 215 Fed.Appx. 863, 864 (11th Cir.2007) (applying *Salerno* standard in facial challenge on Commerce Clause grounds); *Nebraska v. EPA,* 331 F.3d 995, 998 (D.C.Cir.2003)(applying *Salerno* standard on Commerce Clause grounds); *Rancho Viejo, LLC v. Norton,* 323 F.3d 1062,

1077(D.C.Cir.2003)(applying *Salerno* standard in Commerce Clause challenge); *S.D. Myers, Inc. v. City & County of San Francisco,* 253 F.3d 461 467(9th Cir.2001) (applying *Salerno* on facial challenge on Commerce Clause grounds). *Cf. Anderson v. Edwards,* 514 U.S. 143, 155, 115 S.Ct. 1291, 131 L.Ed.2d 178 (1995)(in dicta, applying *Salerno* to facial challenge to California law); *Reno v. Flores,* 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)(apply *Salerno* to facial challenge to immigration regulation).

ther analysis. None of these decisions explicitly applies any standard for a facial challenge in their Commerce Clause analysis. The absence of any standard is not sufficient to justify the rejection of Supreme Court precedent applying *Salerno* in this case; therefore, this Court will apply the *Salerno* doctrine to Plaintiffs' Commerce Clause claims.

This Court finds that Plaintiffs have failed to meet the very high bar set by *Salerno* and have not demonstrated that every application of § 2907.31(D)(1) is a violation of the Commerce Clause. Plaintiffs model their commerce clause challenge after the Southern District of New York's decision in *American Libraries Association v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997), and its progeny. Since *Pataki* is the seminal case with regard to facial challenges to statutes similar to § 2907.31(D)(1), this Court will begin with a discussion of that decision.

In *Pataki*, the court invalidated a New York statute criminalizing the dissemination of material harmful to minors, ruling that the statute violated the Commerce Clause in three particulars: (1) it sought to regulate conduct occurring wholly outside New York state, (2) its burden on interstate commerce far exceeded the benefits of the statute and (3) any regulation of the internet by the states exposed users to inconsistent regulations. *Id.* at 169. At the base of the court's reasoning was the transient nature of communications on the internet. *Id.* at 168. In particular, the court focused on the inability of a user of the internet to ascertain the geographic location of the origin or destination of a communication. The New York statute was deemed a per se violation of the Com-

merce Clause, because, due to the transient nature of communications on the internet, an internet user in California who posts a communication on the internet, with the intention that the recipient be in Oregon, could be held liable in a New York court. Effectively, the New York act would criminalize conduct occurring completely outside the state. *Id.* at 174–77. The court than applied the Pike balancing test and determined that, although protecting children from pedophiles on the internet is a legitimate state interest, the residual benefits that would arise pursuant to its enforcement was far exceeded by the "chilling effect that it produces." *Id.* at 181. The threat of the enforcement of the New York statute would be sufficient to chill the use of the internet as an instrument of interstate commerce. Therefore, the court held the New York provision to be violative of the commerce clause. Lastly, the Southern District of New York found that any state regulation of the internet would submit users to inconsistent regulations. The court analogized the internet to railroads and highways, and stated that:

> effective regulation will require national, and more likely global, cooperation. Regulation by any single state can only result in chaos, because at least some states will likely enact laws subjecting Internet users to conflicting obligations. Without the limitations imposed by the Commerce Clause, these inconsistent regulatory schemes could paralyze the development of the Internet altogether.

*Id.* at 181. According to this reasoning, any state regulation of the internet would be a violation of the Commerce Clause.[9]

---

**9.** *Pataki* and its progeny may have implicitly applied *Salerno*. If a court were to adopt the reasoning that state regulation of the internet was a per se violation of the commerce clause, a plaintiff bringing a facial challenge on commerce clause grounds to statutes criminalizing the dissemination of material harmful to minors would successfully meet the *Salerno* standard, because every application of the regulation would be unlawful.

In light of recent decisions, upholding state statutes prohibiting spam and other fraud perpetrated via electronic mail, and the absence of authority to demonstrate preemption of internet regulation by the Federal government, this Court cannot adopt *Pataki*'s reasoning that the transient nature of the internet renders all state regulation of the internet a violation of the commerce clause. In *Washington v. Heckel*, 143 Wash.2d 824, 24 P.3d 404 (2001), the Washington State Supreme Court upheld a state anti-spam provision. That statute provided that anyone sending "a commercial e-mail message from a computer located in Washington or to an e-mail address held by a Washington resident may not: (1) use a third party's domain name without permission, (2) misrepresent or disguise in any other way the message's point of origin to transmission path, or (3) use a misleading subject line." *Id.* at 828, 24 P.3d at 407. Such conduct was considered a violation of the state's Consumer Protection Act. The Washington Supreme Court found *Pataki* inapplicable and ruled that the provision survived a Commerce Clause challenge. Distinguishing *Heckel* from *Pataki*, the Washington court focused on the difference between regulating all communications on the internet, the conduct proscribed in *Pataki*, and regulating directed e-mails, the conduct proscribed by the Washington statute. *Id.* at 839–840, 24 P.3d at 412. The statute in *Pataki* criminalized both directed and broadcast communications. Its scope encompassed everything from directed e-mails to internet postings. In contrast, the Washington statute criminalized deceptive messages directed to a Washington resident or directed e-mails originating from a computer in Washington. The Washington Supreme Court differentiated the Washington statute by noting that "the Act does not impose liability for messages that are merely routed through Washington or that are read by a Washington

resident who was not the actual addressee." *Id.* at 840, 24 P.3d at 412. In addition that court determined that there did exist some parts of the internet that did not automatically fall outside the police power of the state.

In addition, federal District Courts have recently held that regulation of the internet by the states can be valid under the Commerce Clause. For instance, in *National Federation of the Blind v. Target Corp.*, 452 F.Supp.2d 946 (N.D.Cal.2006), the court held that the internet is not exclusive territory of Congressional regulation and that regulation of internet by California therein was valid. In that case, the court held that applying California's version of the Americans with Disabilities Act to the defendant's web site did not violate the Commerce Clause, because the internet was not the sole province of the federal government. In addition, in *Beyond Sys. v. Keynetics, Inc.*, 422 F.Supp.2d 523 (D.Md.2006), the court concluded that the Maryland Commercial Electronic Mail Act, a state statute that protected Maryland residents from spam, did not violate the Commerce Clause.

Every case cited by Plaintiffs both relies on *Pataki* and reviews statutes whose scope reached to all internet communications, similar to the statute in question in that decision. However, cases like *Heckel* demonstrate that not all state regulation of the internet is a per se violation of the commerce clause.

Section 2907.31(D)(1), with the limiting provisions found in § 2907.31(D)(2), cover a significantly smaller amount of internet communications. Of note, § 2907.31 does not presently apply to broadcast messages, of the type focused upon by the *Pataki* Court. Plaintiffs assert that § 2907.31(D)(1) is a per se violation of the Commerce Clause, because it seeks to regulate conduct occurring wholly outside

Ohio. However, Plaintiffs provide only one example of how the statute at hand would regulate such conduct. This is insufficient to overcome their burden under *Salerno, supra,* that to succeed in a facial challenge to a statute, the plaintiff must show that it is invalid in every application.

Citing the testimony of Plaintiff Tepper, Plaintiffs assert that the Ohio statute will regulate activity occurring wholly outside Ohio, since Tepper, while outside Ohio, may post something on his website with the intention of answering a question from someone in California. Since the internet has no boundaries, the material posted may be seen by a minor in Ohio. This would thereby expose Tepper to criminal liability in Ohio. This hypothetical is almost the exact example used in *Pataki.* Defendants respond that the limiting provisions found in § 2907.31(D)(2) and 2907.01(E),[10] as well as the affirmative defenses [11] provided in § 2907.31 would not criminalize the conduct described by Tepper. Regardless of whether § 2907.31(D) would criminalize this hypothetical conduct, Plaintiffs have failed to meet their burden, as they have not demonstrated that § 2907.31(D)(1) is unlawful in all its applications.

Plaintiffs ask this Court to rule that the internet, like railroads and interstate highways, is "susceptible to regulation only on a national level." In order to make an argument that federal legislation preempts that of the states, the court must look to Congressional intent. Preemption can be express or implied. Express pre-

emption requires evidence that Congress, through explicit language, intended to occupy the field covered by state law. *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). There are two types of implied preemption. Field preemption occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* at 98, 112 S.Ct. 2374 (internal quotation marks and citation omitted). Conflict preemption occurs when both state and federal law are in conflict, such as to make compliance with both physically impossible. *Id.* at 98, 112 S.Ct. 2374.

Plaintiffs are content to cite a few cases to argue that the internet is analogous to railroads and interstate highways, but offer no authority, nor has this Court's research discovered such for any preemption argument, failing to cite authority for Congress' express intent to preempt state regulation of the internet, or any authority demonstrating that congress has so occupied the field of internet regulation as to invalidate all state regulation.

For example, Plaintiffs cite to *Southern Pac. Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), to argue that the internet is similar to railroads for exemption purposes. *Southern Pac. Co.,* involved a challenge to a state statute regulating the number of cars in a train, the Supreme Court invalidating the statute on the ground that the marginal safety bene-

---

**10.** Defendants claim that the posting of the information on Tepper's website would qualify as a "method of mass distribution" under 2907.31(D). Since internet technology does not currently provide the ability to determine the age of the recipient, persons who broadcast information on the internet are not liable under 2907.31(D)(2). Additionally, the material would not be considered harmful to juve-

niles under 2907.01, if it held serious scientific or literary value.

**11.** Defendants assert that Tepper will most likely qualify as a proper person under the affirmative defense in section 2907.31(C)(1), excusing doctors who post material deemed harmful to juveniles on the internet, as long as the material was posted for a bona fide scientific, medical or educational reason.

fits that would be achieved through this regulation was greatly exceeded by the burden on interstate commerce. In particular, the Court pointed to prior federal regulation of railroads and stated that the state regulation "interpose[d] a substantial obstruction to the national policy proclaimed by Congress [in the Interstate Commerce Act]." *Id.* at 767, 65 S.Ct. 1515. In the instant case, Plaintiffs do not point to any prior Congressional action or intention with which Ohio's legislation would interfere.[12]

Plaintiffs next cite to *Bibb v. Navajo Freight Lines Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) as an example of the invalidation of state regulation of highways. In *Bibb*, the Supreme court invalidated an Illinois statute requiring contour mudguards on trucks using the interstate because it placed on unconstitutional burden on interstate commerce. However the Supreme Court made it a point to note that "the power of the State to regulate the use of its highways is broad and pervasive". *Id.* at 523, 79 S.Ct. 962. Therefore, *Bibb* cannot stand for the preposition that regulation of the internet, like interstate highways, requires exclusive national regulation.

Thus, taking into consideration the implications of *Heckel,* the difference in the scope of § 2907.31(D)(1), as compared to the statutes in question in *Pataki* and its progeny, and the absence of authority supporting Plaintiffs' preemption argument, this Court will not adopt *Pataki*'s stance that all regulation of the internet is the exclusive province of the federal government.

Plaintiffs' final Commerce Clause challenge asserts that, even if § 2907.31(D)(1) is not a per se violation of the Commerce Clause, it fails the *Pike* balancing test. Plaintiffs acknowledge that protecting children from sexual predators on the internet is a legitimate governmental interest. However, they claim that the burdens it places on interstate commerce far exceed the benefits, claiming that the statute prohibits a wide range of entirely out of state communication which the State of Ohio has no legitimate interest in regulating, thus chilling commercial activity, because users will fear criminal prosecution in Ohio. Plaintiffs also claim that the benefits likely to be produced by § 2907.31(D)(1) are limited, citing to findings of fact from other cases, and asserting that 40% or more of content on the internet originates outside of the United States, and, thus, outside the jurisdiction of Ohio. Therefore, the argument concludes, § 2907.31(D)(1) will be ineffective in curbing the grooming of children by users outside of the United States and Ohio.

Even if it were proper for this Court to adopt findings of fact from other court decisions, Plaintiffs would still fail to carry their burden. Defendants argue that without the statute in question, efforts to prosecute persons who use the internet to groom children for sexual intercourse will be hampered. Section 2907.31 provides prosecutors with a means to prosecute the grooming of the child. Given the importance of the governmental interest at hand, and, further, given Plaintiffs' failure to establish any countervailing burdens on interstate commerce, § 2907.31(D)(1) passes the *Pike* test.

Accordingly, the Court rejects the Plaintiffs' assertion that § 2907.31(D)(1) violates the Commerce Clause.

---

**12.** Plaintiffs do not cite to the Controlling the Assault of Non–Solicited Pornography and Marketing Act (CAN–SPAM), the Electronic Signature in Global and National Commerce Act (E–Sign) or any other federal regulation of the internet. Therefore, this Court will not address them.

## VI. *PERMANENT INJUNCTION*

 Permanent injunctive relief will be granted only after a plaintiff demonstrates:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, such a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.,* —— U.S. ——, 126 S.Ct. 1837, 1838, 164 L.Ed.2d 641 (2006); *see also Audi AG v. D'Amato,* 469 F.3d 534, 550 (6th Cir.2006). Plaintiffs have demonstrated that § 2907.31(D)(1) is a violation of the First Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). There are no available remedies at law that are adequate to compensate for a loss of First Amendment rights. *See e.g., Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503 (7th Cir. 1998). Considering the balance of hardships, this Court concludes that exposing the Plaintiffs to prosecution under a statute that violates the First Amendment decidedly outweighs any harm which may befall the Defendants as a result of enjoining the enforcement of that statute, § 2907.31(D)(1). This is particularly true in light of the fact that the evidence presented to this Court shows that law enforcement officers in Ohio have been eminently successful at prosecuting pedophiles who are on the internet, under Ohio's importuning statute. Moreover, the public interest is served by injunctive relief which protects First Amendment rights. *Tucker v. City of Fairfield, Ohio,* 398 F.3d 457,

464 (6th Cir.), *cert. denied,* 546 U.S. 929, 126 S.Ct. 399, 163 L.Ed.2d 277 (2005). Accordingly, the Court concludes that the Plaintiffs are entitled to a permanent injunction, preventing the enforcement of § 2907.31(D)(1) to the internet.

## VII. *CONCLUSION*

Plaintiffs' Motion for Summary Judgment (Doc. # 86) on their First Amendment challenge to § 2907.31(D)(1) is sustained (overbreadth and strict scrutiny), while that motion is otherwise overruled. Defendants' Motion for Summary Judgement is overruled, as it relates to Plaintiffs' First Amendment challenge to § 2907.31(D)(1), and is otherwise sustained (First Amendment challenge to § 2907.01(E), void for vagueness challenges to § 2907.31(D)(1) and (2), and Commerce Clause challenge to § 2907.31(D)(1)).

Judgment will be ordered entered in favor of the Plaintiffs and against the Defendants, permanently enjoining Ohio Revised Code § 2907.31(D)(1), as applied to internet communications, and in favor of Defendants and against Plaintiffs on their constitutional challenges to §§ 2907.01(E) and 2907.31(D)(2).

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

